NON-CONFIDENTIAL VERSION

## UNITED STATES COURT OF INTERNATIONAL TRADE

BONNEY FORGE CORPORATION, and
UNITED STEEL, PAPER AND FORESTRY,
RUBBER, MANUFACTURING, ENERGY,
ALLIED INDUSTRIAL AND SERVICE
WORKERS INTERNATIONAL UNION,

              Plaintiffs,

              v.

UNITED STATES,

              Defendant, and

SHAKTI FORGE INDUSTRIES PVT. LTD,

              Defendant-Intervenor.

**Hon. Stephen A. Vaden**
**Ct. No. 20-03837**

## <u>ORDER</u>

Upon consideration of the Rule 56.2 Motion for Judgment on the Agency Record of Plaintiffs Bonney Forge Corporation and the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union and all other papers and pleadings herein, it is hereby

ORDERED that final determination of the U.S. Department of Commerce ("Commerce") is reversed, and it is further

ORDERED that Commerce will re-consider the determination in light of the opinion issued by this Court in this proceeding, and it is further

NON-CONFIDENTIAL VERSION

ORDERED that Commerce will file its remand results with this Court within 90 days of this order and that the parties will file any comments that they may have regarding those remand results within thirty days of date of their filing with this Court.

SO ORDERED.

_____
Stephen A. Vaden, Judge
U.S. Court of International Trade

Dated: _____, 2021
        New York, New York

NON-CONFIDENTIAL VERSION

## UNITED STATES COURT OF INTERNATIONAL TRADE

BONNEY FORGE CORPORATION, and
UNITED STEEL, PAPER AND FORESTRY,
RUBBER, MANUFACTURING, ENERGY,
ALLIED INDUSTRIAL AND SERVICE
WORKERS INTERNATIONAL UNION,

Plaintiffs,

v.

UNITED STATES,

Defendant, and

SHAKTI FORGE INDUSTRIES PVT. LTD,

Defendant-Intervenor.

**Hon. Stephen A. Vaden**
**Ct. No. 20-03837**

## PLAINTIFFS' RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD

Pursuant to Rule 56.2(a) of the Rules of the United States Court of International Trade, Plaintiffs Bonney Forge Corporation ("Bonney Forge") and the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union ("USW") hereby move this Court for judgement on the agency record. This action challenges the negative portion of the U.S. Department of Commerce's ("Commerce") final results of the antidumping duty investigation of forged steel fittings from India. *See Forged Steel Fittings from India,* 85 Fed. Reg. 66,306 (Dep't Commerce Oct. 19, 2020) (final aff. deter. LTFV sales) (APPX14186-14189). As demonstrated in Plaintiffs' Memorandum in Support of Rule 56.2 Motion for Judgment

1

NON-CONFIDENTIAL VERSION

on the Agency Record, Commerce's final determination that Shakti Forge Industries Pvt. Ltd. ("SFIPL") had not made sales at less than fair value during the period of investigation is not supported by substantial evidence and is otherwise contrary to law.

## **PROPOSED RELIEF**

Bonney Forge and the USW request that that this Court find that Commerce's final determination regarding SFIPL was not supported by substantial evidence and was otherwise contrary law, and that it remand this proceeding to Commerce with instructions for further proceedings consistent with such a decision. A proposed order is attached for the Court's consideration.

Respectfully submitted,

/s/ William Fennell

Roger B. Schagrin
William A. Fennell
SCHAGRIN ASSOCIATES
900 Seventh Street NW
Washington, D.C. 20001
(202) 223-1700
*Counsel for Bonney Forge Corporation and the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union*

NON-CONFIDENTIAL VERSION

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| BONNEY FORGE CORPORATION, and UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION,<br><br>        Plaintiffs,<br><br>        v.<br><br>UNITED STATES,<br><br>        Defendant, and<br><br>SHAKTI FORGE INDUSTRIES PVT. LTD,<br><br>        Defendant-Intervenor.<br><br>   . | **Hon. Stephen A. Vaden**<br>**Ct. No. 20-03837** |

## PLAINTIFFS' MEMORANDUM IN SUPPORT OF RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD

Roger B. Schagrin
William A. Fennell
SCHAGRIN ASSOCIATES
900 Seventh Street NW
Washington, D.C. 20001
(202) 223-1700

*Counsel for Bonney Forge Corporation and the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union*

Dated:  April 26, 2021

NON-CONFIDENTIAL VERSION

### TABLE OF CONTENTS

I.     Administrative Determination Sought To Be Reviewed...........................................1

II.    Issues Presented .......................................................................................................1

III.   Statement of Facts ...................................................................................................2

       Commerce's Failure to Verify .................................................................................3

       Commerce's Acceptance of SFIPL's Cost Reporting .............................................4

IV.    Standard of Review...................................................................................................6

V.     Argument .................................................................................................................7

       A.     Summary of Argument .................................................................................7

       B.     Commerce's Failure to Verify SFIPL's Information Was Contrary to Law...8

       C.     Commerce's Conclusion that SFIPL's Reporting of Processing Costs Was
              Consistent with Its Descriptions of that Processing Was Not Supported by
              Substantial Evidence. .................................................................................13

              1.     Background.....................................................................................14

              2.     SFIPL's Initial responses ................................................................16

              3.     SFIPL's Subsequent Claims ...........................................................17

              4.     Commerce's Determination .............................................................23

VI.    CONCLUSION........................................................................................................25

NON-CONFIDENTIAL VERSION

TABLE OF AUTHORITIES

**Cases**

*Atl. Sugar, Ltd. v. United States.* 744 F.2d 1556 (Fed. Cir. 1984) ................................. 8, 26

*Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S 837 (1984).... 7

*Consolidated Edison Co. v. NLRB*, 305 U.S. 197 (1938) ................................... 7

*Hung Vuong Corp. v. United States*, Slip Op. 20-174 (Ct. Int'l Trade Dec. 3, 2020) ....... 25

*Industrial Quimica Del Nalon, S.A. v. United States,* 13 CIT 1055, 729 F.Supp. 103
(1989) ................................................................................................. 10

*Industrial Quimica Del Nalon, S.A. v. United States,* 14 CIT 143, 732 F.Supp. 1180
(1990) *petition denied, United States. v. Industrial Quimica Del Nalon, S.A.,* 904 F.2d
44 (T) (Fed. Cir. 1990) .................................................................................... 10

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29
(1983) ................................................................................................. 25

*New American Keg, d/b/a American Keg Company v. United States*, Slip Op. 21-30 (Ct.
Int'l Trade Mar. 23, 2021) ................................................................................ 11

*Nippon Steel Corp. v. United States*, 337 F.3d 1373 (Fed. Cir. 2003) ..................... 7, 8, 26

*Thai Plastic Bags Industries Co. v. United States*, 853 F.Supp.2d 1267 (2012) .............. 26

*The Timken Co. v. United States***,** *18 CIT 486, 852 F.Supp. 1122 (1994)* ......................... 10

*Tianjin Magnesium Int'l Co. v. United States,* 34 CIT 980, 722 F.Supp.2d 1322 (2010) . 25

*Universal Camera Corp. v. NLRB*, 340 U.S. 474 (1951) ................................................. 8

**Statutes**

19 U.S.C. § 1516a(b)(1)(B)(i) ........................................................................... 6

19 U.S.C. § 1677b(f)(1)(A) ................................................................................ 15

19 U.S.C. § 1677m(i)(1) .................................................................................... 1

**Administrative Determinations**

*Forged Steel Fittings from India and the Republic of Korea*, 84 Fed. Reg. 64265 (Dep't
Commerce Nov. 21, 2019) (init. LTFV investigations) ................................................. 2

*Forged Steel Fittings From India*, 85 Fed. Reg. 32,007 (Dep't Commerce May 28, 2020)
(prelim. aff. deter. LTFV sales, postponement of final deter., and ext. of provisional
measures) ............................................................................................... 1

*Forged Steel Fittings from India,* 85 Fed. Reg. 66,306 (Dep't Commerce Oct. 19, 2020)
(final aff. deter. LTFV sales) ............................................................................. 1

Issues and Decision Memorandum for the Final Determination in the Less-Than-Fair-
Value Investigation of Carbon and Alloy Steel Threaded Rod from the People's
Republic of China (Feb 7, 2020) ......................................................................... 1

*Strontium Chromate from France*, 84 Fed. Reg. 53,678 (Dep't Commerce Oct. 8, 2019)
(*final deter. LTFV sales*) .................................................................................. 10

## I.    ADMINISTRATIVE DETERMINATION SOUGHT TO BE REVIEWED

Plaintiffs Bonney Forge Corporation ("Bonney Forge") and the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union ("the USW") challenge the final negative result as to Shakti Forge Industries Pvt. Ltd.[1] of the Department of Commerce's ("Commerce") antidumping investigation of imports of forged steel fittings from India during the period from October 1, 2018 through September 30, 2019. These results were issued by the Department of Commerce as *Forged Steel Fittings from India,* 85 Fed. Reg. 66,306 (Dep't Commerce Oct. 19, 2020) (final aff. deter. LTFV sales)  ("*FSF Final Deter.*") (APPX14186-14189) incorporating the Decision Memorandum for the Final Determination in the Less-Than-Fair-Value Investigation of Forged Steel Fittings from India (Oct. 13, 2020) ("*Final IDM*") (APPX14126-14148)**.**[2]

Commerce preceded these notices with its preliminary results.  *See Forged Steel Fittings From India,* 85 Fed. Reg. 32,007 (Dep't Commerce May 28, 2020) (prelim. aff. deter. LTFV sales, postponement of final deter, and ext. of provisional measures) ("*FSF Prelim. Deter.*"), (APPX11745-11748**)**.

## II.    ISSUES PRESENTED

*1.  Whether Commerce's failure to verify the information supplied by SFIPL that it relied on to make its final determination in the investigation was contrary to law?*

**Plaintiffs' position:**  Yes, the statute requires that information relied on by Commerce in an investigation be verified.  19 U.S.C. § 1677m(i)(1).  Commerce did not verify the information

---

[1]    Shakti Forge Industries Pvt. Ltd. adopted the acronym "SFIPL" for itself during the investigation.  Petitioners' use the acronym to refer to the company in this brief.

[2]    Per "Joint Appendix Preparation in § 1581(c) Cases Assigned to Judge Vaden" all record citations are to bates-numbered appendix pages.

1

it relied on for its final determination and did not issue a verification report and so acted contrary to law.

2. *Whether Commerce's reliance on SFIPL's inconsistent reporting of processing costs was supported by substantial evidence and otherwise consistent with the law?*

**Plaintiffs' position:** No. SFIPL reported that it processed fittings in different markets to different types of customers using different processing methods. Yet it reported processing costs without regard to where its fittings were sold. Commerce relied on SFIPL's reporting of processing costs that were inaccurate and so its margin calculation was not supported by substantial evidence and was otherwise contrary to law.

## III.   STATEMENT OF FACTS
### Background

On October 23, 2019, Bonney Forge and the USW filed a Petition with the Department of Commerce alleging that forged steel fittings had been exported from India and sold in the United States for less than fair value. *See* Commerce Department Antidumping Duty Investigation Initiation Checklist at 2 (Nov. 13, 2019) (APPX2654). Commerce initiated an investigation of the imports on November 12, 2019. *See Forged Steel Fittings from India and the Republic of Korea*, 84 Fed. Reg. 64265 (Dep't Commerce Nov. 21, 2019) (init. LTFV investigations) (APPX2695) (noting that initiation was effective as Nov. 12, 2019). Commerce selected two mandatory respondents to investigate, SFIPL and Nikoo Forge Pvt., Ltd. Commerce memorandum "Antidumping Duty Investigation of Forged Steel Fittings from India: Selection of Respondents for Individual Examination" at 1 (Jan. 2, 2020) (APPX2900). Nikoo chose not to participate, (Nikoo Letter at 1 (January 13, 2020 (APPX3223)), and Commerce selected a second respondent to investigate, Pan International. Commerce memorandum "Antidumping Duty Investigation of Forged Steel Fittings from India: Selection of Additional Respondent for

Individual Examination" at 1 (Jan. 22, 2020) (APPX3237).  Pan International also withdrew

from participation. Pan International Letter at 1 (Jan. 28, 2020 (APPX3400).

### Subject Merchandise

The scope description of subject merchandise reads in part:

> The merchandise covered by this investigation is carbon and alloy forged steel
> fittings, whether unfinished (commonly known as blanks or rough forgings) or
> finished. Such fittings are made in a variety of shapes including, but not limited
> to, elbows, tees, crosses, laterals, couplings, reducers, caps, plugs, bushings,
> unions (including hammer unions), and outlets. Forged steel fittings are covered
> regardless of end finish, whether threaded, socket-weld or other end connections.
> The scope includes integrally reinforced forged branch outlet fittings, regardless
> of whether they have one or more ends that is a socket welding, threaded, butt
> welding end, or other end connections.

*FSF Final Deter.,* 85 Fed. Reg. at 66,308 (APPX14188).

### Commerce's Failure to Verify

During the course of the investigation, Commerce sent an original and then six

supplemental questionnaires to SFIPL.  Commerce questionnaires were dated: Jan. 2, 2020

(APPX2906), March 2, 2020 (APPX6022), March 27, 2020 (APPX6051); April 10, 2020

(APPX8108), June 16, 2020 (APPX11761), and July 2, 2020 (APPX11816).  SFIPL responded

to each of the questionnaires. Following its preliminary determination, Commerce asked SFIPL a

series of specific questions about its questionnaire responses in two supplemental questionnaires.

DOC Shakti 2nd Sec. D Supplemental Questionnaire (June 15, 2020) (APPX89114-89118) and

DOC Shakti 6th Supplemental Questionnaire (July 2 2020) (APPX89535-89538).  All of the

questions consisted of requests for new information or explanation of existing information except

for one.  In the 6th supplemental, Commerce asked SFIPL to "provide complete information to

corroborate the information you reported for the following sales in the home and U.S. markets."

After transmitting these questionnaires, on August 4, 2020, Commerce issued a memorandum

"Cancellation of Verification and Briefing Schedule," in which it indicated that because a Global

Level 4 travel advisory had been imposed, preventing Commerce personnel from traveling to conduct verification, and due to the impending statutory deadline for the completion of investigation, Commerce was unable to conduct verification in the investigation. APPX13906.

In their case brief, filed a week later, Bonney Forge and the USW asked Commerce to verify SFIPL's questionnaire responses remotely if it could not verify the information in person. Petitioners' Case Brief at 19-20 (Aug. 11, 2020) (public version: APPX13969-13964) ("*Pet. PV Case Brief*").

In its final decision memorandum, Commerce retroactively characterized its supplemental questionnaires as constituting verification even though it did not ask for any documents to corroborate SFIPL's cost reporting or issue a verification report.  *See Final IDM*  at 2-3 (APPX14127-14128).  In the final results Commerce issued in October of 2020, SFIPL received a margin of zero percent.

### Commerce's Acceptance of SFIPL's Cost Reporting

As part of its questionnaire responses, SFIPL provided databases with information on its home market and U.S. sales as well as cost worksheets showing, *inter alia*, input materials consumption, labor costs, and power and fuel costs.  *See* SFIPL Sections B and C Questionnaire Response at Exhibits B-1 and C-1 (Feb. 24, 2020) (APPX3751-3755, APPX4034-4038) ("*SFIFL Sec. BC QR*") and SFIPL Section D Questionnaire Response at Exhibit D-10 (APPX4587-5488, APPX4606-4613), Exhibits D-11 and D-12 (APPX4808-4809, APPX4826-4828, APPX5100-5101, APPX5118-5126), Exhibit D-13(a) (APPX5401-5402, 5419-5421), and Exhibit D-13(b) (APPX5729-5730, APPX5747-5748) ("*SFIPL Sec. D QR"*).  The databases were organized by what Commerce calls a "CONNUM." *See, e.g.,* Commerce Initial request for Information at D-2 (Jan. 2, 2020) (APPX3007).  Commerce does not allow respondents to organize product sales

and cost information based on their own model numbers as these may be inconsistent between markets and can be manipulated to reduce dumping margins.  Instead, Commerce typically requires that respondents create unique CONNUMs based on the physical characteristics of the products they sell. *See SFIFL Sec. BC QR* at B-10-B19 (APPX3716-3724).  As some products that a respondent distinguishes by product name or model may share physical characteristics, a respondent's reporting of information for a single CONNUM may incorporate information for two or more respondent-specific products.

In this investigation, SFIPL reported both its sales information and its costs by CONNUM.  In its sales databases, SFIPL reported information on each of its sales transactions, including the CONNUM for the product sold, its price, and its quantity.  *SFIFL Sec. BC QR* at B-3–B-5 (APPX3708-3710).  SFIPL reported its information on material consumption, labor, and power and fuel cost by CONNUM in its various cost worksheets.

In its Section A questionnaire response, SFIPL provided a description of the processing it performed to produce its fittings. *SFIPL Section A Questionnaire Response* at Exhibit A-10(a) (APPX3635-3639) ("*SFIPL Sec. A QR*").  That description identified two stages in its processing, a "FORGING" stage and a "MACHINE PROCESSING & PACKING" stage. In both stages, SFIPL identified different types of processing depending on the customer type (traders and end-users/OEMs in the home market) and market (home market and export) for which the forgings were being sold.  *Id.* In their case brief, Petitioners provided reports showing that the processing costs identified by SFIPL as only being incurred for fittings sold to end users/OEM customers in the home market and for export were reported for [

] but were not reported for [

] *See* Petitioners' Case Brief at 9-13 (APPX91578-91582).

Before briefing in the investigation, SFIPL had asserted that it had meant to distinguish between processing performed on finished and unfinished fittings. SFIPL Response for 4th supplemental questionnaire at 1-2 (April 27, 2020) (APPX8822) ("*SFIPL 4ᵗʰ Sup. QR*"). For its final determination, Commerce accepted SFIPL's explanation and rejected Petitioners claims regarding this mis-reporting:

> Third, concerning the petitioners' argument that processing costs were inaccurately reported when taken against narrative descriptions made in the responses, we disagree.  The petitioners provided an analysis of the reported costs that were based on initial statements made by the respondent which petitioners did not take into account . . . The products that the petitioners included in their "exception" report were sold to traders in the home market that were found to have processing costs refer to finished fittings, "1," and are expected to have finishing costs.

*Final IDM* at 19 (APPX14144).

## IV.    STANDARD OF REVIEW

The applicable standard of review is set forth in 19 U.S.C. § 1516a(b)(1)(B)(i).  Pursuant to the statute, the Court holds unlawful any determination found to be unsupported by substantial evidence on the record, or otherwise not in accordance with law.

### <u>Contrary to Law</u>

To determine whether Commerce's interpretation of a statute is in accordance with law, the Court applies the two-prong test set forth in *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S 837 (1984).  First, the Court determines "whether Congress has directly spoken to the precise question at issue." *Id.* at 842. If the plain language of the statute is clear, that is the end of the matter. *Id.* at 842-843.  If the plain language of the statute is silent or ambiguous on the question at issue, however, "the question for the court is whether the agency's

answer is based on a permissible construction of the statute." *Id.* at 843 (footnote omitted). If the agency's interpretation is reasonable, it will be upheld by the Court. The Supreme Court has affirmed that the two-step *Chevron* test applies in the judicial review of Commerce antidumping determinations. *See United States v. Eurodif S.A.*, 555 U.S. 305, 316 (2009).

**Substantial Evidence**

Substantial evidence has been defined as "more than a mere scintilla," and as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1379 (Fed. Cir. 2003); (*quoting Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L. Ed. 126 (1938)). In determining whether substantial evidence exists, the court must consider "the record as a whole, including evidence that supports as well as evidence that fairly detracts from the substantiality of the evidence." *Nippon Steel Co. v. United States*, 337 F.3d at 1379 (Fed. Cir. 2003) (*quoting Atl. Sugar, Ltd, v. United States.* 744 F.2d 1556, 1562 (Fed. Cir. 1984)); *see also Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951). The standard also requires Commerce to "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Tianjin Magnesium Int'l Co. v. United States,* 34 CIT 980,982, 722 F.Supp.2d 1322, 1328 (2010) (*quoting Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, (1983)).

V.    **ARGUMENT**

   A.  **Summary of Argument**

In the investigation on appeal, Commerce made two significant errors, each of which affected its determination that SFIPL did not make sales at less than fair value during the POI and each of which warrants remand.

First, Commerce erred as a matter of law by not verifying the information it relied on to make its final determination regarding SFIPL and not providing a verification report.

Second, Commerce also erred by determining that SFIPL's reporting of processing costs was supported by substantial evidence. As Petitioners demonstrated during the investigation, SFIPL reported finishing costs on CNC machines for the fittings that it sold to [

            ], and it conversely failed to report finishing costs on CNC machines for fittings sold to [                ].  Both of these were contrary to SFIPL's narrative description of its manufacturing processes, in which SFIPL stated that it performed CNC machine finishing for fittings sold in the United States but not for fittings sold to traders in the home market. This erroneous reporting had the effect of [

                                    ]. Commerce's reliance on the mis-attributed costs was not supported by substantial evidence.

### B.  Commerce's Failure to Verify SFIPL's Information Was Contrary to Law.

The statute clearly states that Commerce is required to verify the information it relies upon in an antidumping investigation: "The administering authority shall verify all information relied upon in making … a final determination in an investigation." 19 U.S.C. § 1677m(i)(1). There is no ambiguity in this statutory command. There is also no discretion under the statute for Commerce to refuse to verify the information upon which it relies, even in extenuating circumstances.

Commerce's regulations state that Commerce "will verify factual information" upon which it relies in an antidumping investigation. 19 C.F.R. § 351.307(b)(1)(i). In addition, during verification, Commerce's regulations state that "employees of the Department will request access to all files, records, and personnel which the Secretary considers relevant to the factual

NON-CONFIDENTIAL VERSION

information submitted" by respondents. 19 C.F.R. § 351.307(d). Finally, Commerce's regulation requires Commerce to issue a verification report to the parties that explains the "methods, procedures, and results of a verification" prior to its final determination. 19 C.F.R. § 351.307(c).

This court has explained that Commerce has a statutory duty to verify the information which it relies upon in a proceeding: "Verification tests the facts upon which conclusions are to be drawn and indicates whether they will reflect an acceptable degree of certainty …. {Commerce} does have a statutory obligation to properly verify those facts which it finds dispositive." *Smith Corona Corp. v. United States*, 15 C.I.T. 355, 366, 771 F. Supp. 389, 399 (1991).

The court has remanded Commerce determinations where Commerce failed to conduct the required verification:

> In fact, the Court can find no alternatives to requiring ITA to comply with the clear language of the statute. The government's action in failing to verify was not in accordance with the law. Consequently, the government erred in not conducting verification as required by 19 U.S.C. § 1677e. In this instance, ITA should verify Asturquimica's responses on remand and should consider the information submitted by Asturquimica in its pre-hearing brief, if such is the type of information normally relied upon or received by ITA when conducting verification.

*Industrial Quimica Del Nalon, S.A. v. United States,* 13 CIT 1055, 1060, 729 F.Supp. 103, 109 (1989).[3] *See also The Timken Co. v. United States,* 18 CIT 486, 495-96, 852 F.Supp. 1122, 1130 (1994) (*"Clearly, if Commerce were conducting its third consecutive review without yet making

---

[3]   Following remand, the Court certified the verification issue for appeal to the Federal Circuit, *Industrial Quimica Del Nalon, S.A. v. United States,* 14 CIT 143, 145, 732 F.Supp. 1180, 1182 (1990) *petition denied, United States. v. Industrial Quimica Del Nalon, S.A.,* 904 F.2d 44 (T) (Fed. Cir. 1990). Note that the court in *Industrial Quimica* was addressing the requirement in 19 U.S.C. § 1677e to conduct verifications in certain administrative reviews. The statutory provision requiring verification in investigations is even stronger, as it applies to all investigations, regardless of whether verification is requested or not. See 19 U.S.C. § 1677m(i)(1).

a verification and an interested party had made a timely request for verification, as had occurred in *Industrial Quimica*, Commerce would be required to do so.")

The court has also explained that "verification is like an audit, the purpose of which is to test information provided by a party for accuracy and completeness." *Bomont Industries v. United States*, 14 C.I.T. 208, 209, 733 F.Supp. 1507, 1508 (1990). Indeed, this court recently remanded an investigation to Commerce where verification was conducted, but crucial, dispositive facts were not verified, noting that verification is a "critical aspect of Commerce's antidumping investigation …." *New American Keg, d/b/a American Keg Company v. United States*, Slip Op. 21-30 at 6 (Ct. Int'l Trade Mar. 23, 2021).

To implement this statutory requirement, Commerce has a standard practice in investigations and some administrative reviews of scheduling verification visits to respondent facilities, including manufacturing and sales facilities.  In advance of such visits, Commerce sends a verification outline that identifies the types of information that respondents must assemble in advance of verification for review during verification. *See, e.g.: Strontium Chromate from France*, 84 Fed. Reg. 53,678 (Dep't Commerce Oct. 8, 2019) (final deter. LTFV sales), and accompanying Issues and Decision Memorandum at Comment 1 ("the purpose of providing a verification outline is to give respondents sufficient notice about the types of information and source documents that Commerce will examine, and to afford respondents sufficient time to compile the information."); *Certain Biaxial Integral Geogrid Products from the People's Republic of China*, 82 Fed. Reg. 3284 (Dep't Commerce Jan. 11, 2017) (final deter. LTFV sales), and accompanying Issues and Decision Memorandum at Comment 3 ("the verification outline listed specific instructions as to what information Taian Modern was expected to provide."); *Certain Cold-Drawn Mechanical Tubing of Carbon and Alloy Steel from the Republic of Korea*,

83 Fed. Reg. 16,319 (Dep't Commerce Apr. 16, 2018) (final deter. LTFV sales), and

accompanying Issues and Decision Memorandum at Comment 1 ("verifiers have requested

samples of documents associated with various accounting functions – the verification outline

asked to identify all reports generated from the data system in the ordinary course of business.").

Petitioners typically have an opportunity to submit comments on the types of items they believe

should be included in the verification outline. Petitioners also receive a copy of the underlying

documents examined by Commerce during verification, so-called "verification exhibits," which

are often very voluminous. Finally, Commerce produces a verification report that summarizes the

results of its verification. *See* 19 C.F.R. § 351.307(c).

As noted above, this court has recognized that verification is "critical," because it serves

as a kind of audit to test the accuracy of the information that respondents have reported. Indeed,

there are any number of cases where, at verification, Commerce has discovered that the

information respondents have reported is not supported by the company's own books and records

or has even been created solely for the purposes of engineering artificially low dumping margins

in Commerce's proceedings. *See, e.g.*, *Pure Magnesium from the People's Republic of China*, 74

Fed. Reg. 66,089 (Dep't Commerce Dec. 14, 2009) (final admin. review results) and

accompanying Issues and Decision Memorandum at Comment 1 (describing company

representatives falsifying documents, barring Commerce officials from viewing business records,

and throwing boxes of voucher books out the window to avoid review during verification). In

addition, the fact that the verification outline, verification exhibits, and verification report are all

available to Petitioners ensures basic fairness by giving Petitioners their own opportunity to

comment on the accuracy of respondents' reporting and its reliability for the purposes of

calculating dumping margins.

NON-CONFIDENTIAL VERSION

None of those goals were achieved in this investigation.  Commerce stated that it was not going to verify SFIPL's information due to State Department travel restrictions. Memo from USDOC to File Pertaining to Interested Parties Cancellation of Verification and Briefing Schedule at 1 (Aug. 4, 2020) (APPX13906).  In their case brief, filed one week after learning that Commerce did not plan to conduct an on-site verification, Petitioners urged Commerce to undertake a virtual verification of SFIPL instead. Petitioners' Case Brief at 19-20 (Aug. 11, 2020) (APPX13969-13964). Petitioners also raised a number of issues in their case brief (including those raised elsewhere in this brief) that could have been addressed in some measure by verification of SFIPL's data. Even though there were at least two months remaining between the case briefs and the final determination, Commerce did not obtain information necessary to confirm the accuracy of the information that it relied for its final determination or produce a verification report.  These failures were contrary to law. They alone provide sufficient and necessary grounds for a remand of this action.

Moreover, the Court should reject Commerce's attempt to retroactively characterize certain supplemental questions regarding the corroboration of sales documentation as "verification." *See Final IDM* at 2-3 (APPX14127-14128). These supplemental questions on their own did not meet any of Commerce's own regulatory requirements for verification, including the issuance of a verification report to all of the parties. *See* 19 C.F.R. § 351.307(c). In addition, the supplemental questions pertained only to certain sales information, and not to the cost reporting on which Commerce also relied in its final results.  *See* DOC Shakti 2nd Sec. D Supplemental Questionnaire (June 15, 2020) (APPX89114-89118) and DOC Shakti 6th Supplemental Questionnaire (July 2 2020) (APPX89535-89538).   As explained below, SFIPL's

cost reporting had a dispositive impact on SFIPL's dumping margin, and Commerce's failure to

verify this crucial information upon which it relied was therefore contrary to law.

### C. Commerce's Conclusion that SFIPL's Reporting of Processing Costs Was Consistent with Its Descriptions of that Processing Was Not Supported by Substantial Evidence.

In their case brief, Petitioners identified two different ways in which SFIPL's descriptions

of its processing and its reporting of costs for that processing were inconsistent: (1) CNC

machine finishing costs were reported for [                                    ]; and (2) CNC

machining costs were not reported [                    ]. *See* Petitioners' Case Brief at 9-13

(APPX91578-91582). The issue raised by SFIPL's reporting is whether its descriptions of its

processing are consistent with reporting its costs in this way.  In other words, does the record

indicate that SFIPL performed different types of processing on fittings [

                                    ]? More specifically, does SFIPL's description of its

processing operations support the conclusion that the products sold [

         ] were CNC finished, while the products sold to the [              ] were not CNC finished?

As we show below, the answer is a resounding no.

As explained in more detail below, at the outset of the investigation, SFIPL reported that

different processing was in fact performed on products sold to different markets. Its cost

reporting was, however, inconsistent with this original description. In an attempt to defend its

inconsistent cost reporting, SFIPL asserted that the distinctions it was actually referring to were

those between unfinished fittings that were not finished and those that were finished.  SFIPL's

explanation may explain away differences in the processing performed in the "FORGING" stage

of its manufacturing process, such as heat treatment.  But the differences between finished and

unfinished fittings cannot explain the distinctions explicitly made by SFIPL between the

finishing processing performed on finished fittings – by definition, unfinished fittings are not subject to any of the machining processes that transform unfinished fittings to finished fittings. Nor do SFIPL's claims regarding finished and unfinished fittings explain SFIPL's later distinction between finishing performed on lathes versus that performed on CNC machines that was dependent on the market in which the fittings were sold. Again, unfinished fittings by definition could not be machined either on lathes or on CNC machines. Below we lay out the inconsistencies in SFIPL's reporting in more detail.

As Petitioners demonstrated in their case brief, there are at least two different ways in which substantial evidence did not support SFIPL's cost reporting. Despite these fatal flaws in SFIPL's reporting, Commerce accepted SFIPL's reporting as consistent and as reasonably reflecting the costs associated with its production. In doing so, Commerce failed to consider the record as a whole, including evidence highlighted by Petitioners that fairly detracted from Commerce's conclusion. Commerce also failed to articulate a rational connection between the facts and its conclusions. Commerce's determination is therefore unsupported by substantial evidence and should be remanded.

## 1. Background

Commerce requires that respondents reconcile their reported information to their accounting records and financial statements. *See, e.g., id.* at B-7 (APPX3712); *SFIPL Sec. D QR* at D-36 (APPX4513).  For example, the quantities of materials, power, and labor costs reported by CONNUM are to add up to totals that are consistent with the respondents' accounting records. Respondents may reduce dumping margins by allocating costs away from certain products such as those sold in the United States.  Different allocations among CONNUMs does not affect the reconciliation of total costs to accounting records so long as the total quantities allocated remain the same.

14

NON-CONFIDENTIAL VERSION

The statute specifies regarding costs that:

> Costs shall normally be calculated based on the records of the exporter or producer of the merchandise, if such records are kept in accordance with the generally accepted accounting principles of the exporting country (or the producing country, where appropriate) and reasonably reflect the costs associated with the production and sale of the merchandise. The administering authority shall consider all available evidence on the proper allocation of costs, including that which is made available by the exporter or producer on a timely basis, if such allocations have been historically used by the exporter or producer, in particular for establishing appropriate amortization and depreciation periods, and allowances for capital expenditures and other development costs.

19 U.S.C. § 1677b(f)(1)(A).

In this investigation, SFIPL explained in its cost questionnaire response:

> SFIPL, in the normal course of business, does not maintain a cost accounting system as such. That is, SFIPL does not maintain any pre-calculated standard costs for pre-defined products that are then used as a basis for management reporting, financial reporting or any other type of analysis. For individual products, no standard costs are collected, no variances are accumulated, and no reconciliation is done between cost accounting and financial accounting.

> In the normal course of business, SFIPL collects cost data only on an aggregate basis, based on the amounts actually booked under the various accounts maintained in the financial accounting system, which is the basis for management review. Hence, for purpose of this response, the costing methodology used by SFIPL is reported in detail in the subsequent responses.

*SFIPL Sec. D QR* at D-3-4 7 (APPX4492-4493).

Because SFIPL maintained only aggregate cost information, it had to allocate its costs to specific products for reporting to Commerce.  Thus, SFIPL developed cost reporting for purposes of this investigation. *Id.* at D-26-27 (APPX4503-4504).  Regardless of its origin, cost reporting must "reasonably reflect the costs associated with the production and sale of the merchandise." 19 U.S.C. § 1677b(f)(1)(A).  This means that for Commerce to accept a respondent's cost reporting as accurate it must, *inter alia,* be internally consistent, and it must be consistent with the respondent's description of its manufacturing and product sales.  For example, if a respondent

reports that it incurs the greatest costs to produce the merchandise sold as subject merchandise in the U.S., it cannot then report specific costs for the products sold in the home market that have greater costs than those sold in the U.S.

### 2. SFIPL's Initial responses

In its initial cost questionnaire response, SFIPL reported that it sold its fittings in the home market to two different kinds of customers: (1) traders or distributors; and (2) end users. *See SFIPL Sec. A QR* at A-16 (APPX3431). The former were identified in SFIPL's home market sales database as sales at a level of trade coded as "1"; the latter as sales at a level of trade coded as "2". *SFIPL Sec. BC QR* at B-32 (APPX3737). All export sales to the U.S. were identified as sales to distributors. *Id.* at C-30 (APPX4009).

In that same initial questionnaire response, SFIPL provided an extensive description of the two-part processing it performed to produce its fittings.[4] It identified the first stage as the "FORGING PROCESS." This stage included: (1) the purchase of raw material, (2) testing, (3) cutting, (4) heating, (5) forging, (6) trimming, (7) heat treatment, (8) physical test, and (9) surface finishing. The second stage was identified as "MACHINING PROCESS & PACKING." This stage included: (1) drilling, (2) boring and end connection preparation, (3) galvanizing/zinc plating, (4) marking, (5) cleaning and rust prevention, (6) final inspection, and (7) packing. *SFIPL Sec. A QR* at Exhibit A-10(a) (APPX3635-3639). In its description of these processes, SFIPL included extensive language that distinguished between the processing performed for fittings sold to traders in the home market and those sold to end-users/OEMs in the home market and for export.

---

[4] SFIPL also included a flowchart of its processing as Exhibit D-1 to its Section D Questionnaire response. APPX82773.

SFIPL also reported that it performed different functions to sell to end-users from those performed to sell to traders in that market:

> SFIPL is required to perform several additional selling function for its end-user customer as compared to sales to home market customers. For home market end-user customers, SFIPL is required to obtain quality assurance (QAP) plan and detailed drawing approved by the end-user. As per QAP, end-user customer requires inspection at intermediate production stages as well as at the final post production stage inspection either by the end-user or his appointed third party inspector. All such inspection for the home market end-user requires additional time and efforts involving cost. Also end-user customer requires specific hard punch marking (including unique marking of third party inspection). Further in case on end-user customer, there is a process of vendor Approval, wherein the customer or his appointed third Party visits SFIPL for factory assessment to evaluate, Process knowledge, quality system, production capability, infrastructure.

> These services are specifically for the home market end-user customer and not for traders.

*SFIPL Sec. BC QR* at B-32 (APPX3737).

### 3. SFIPL's Subsequent Claims

In a supplemental questionnaire, Commerce asked SFIPL to explain the extensive differences in the processing performed on fittings that it described in its Section A response:

> Your questionnaire response indicates that there are [
>
>                                                                                          ].
>
> Specifically, your Section A response indicates [

] Your questionnaire response also appears to indicate that products sold in the home market to [                              ]; however, your cost database and home market sales database [
                                                    ]. Please recode the sales in your home market sales database to indicate which sales are of [              products. In addition, ensure that the costs incurred in [
                                    ] sold to home market distributors. Incorporate the changes related to the FINISHH/U characteristics discussed above in the cost database that is due on April 24, 2020.

Commerce Antidumping Duty Investigation of Forged Steel Fittings from India: Sections A

through D Supplemental Questionnaire at 3 (April 16, 2020) (footnote omitted) (APPX85197).

> SFIPL provided this response:
>
> SFIPL revisited its production process submitted at Exhibit 10(a) of Section A response and noticed that all the cases were it was mentioned that several steps are not undertaken for sale to home marker distributor are **pertaining to un-finished forged fitting**. Since these fitting are not fully finished hence these several steps are not required to be performed. SFIPL erroneously omitted to provide any reference for the word "unfinished" fitting in exhibit 10(a) of section A.

*SFIPL 4ᵗʰ Sup. QR* (APPX8822) (emphasis in original).

> SFIPL further elaborated in its rebuttal brief:
>
> Thus, SFIPL has clarified that since the unfinished fittings sold to trader hence the production process provided at Section A refer about several processes which is not required to be performed because those are pertaining to unfinished fitting (coded as FINISHH/U = 2) which are mainly sold to domestic traders/distributors. In section A SFIPL had omitted to provide reference which has been rectified in the in the 5SQR by SFIPL.

SFIPL Rebuttal Case Brief at 14 (Aug. 24, 2020) (APPX91777) ("*SFIPL Rebuttal Brief*").

Despite its assertions that the processing differences it had referred to Exhibit 10(a) had

only to do with unfinished forgings, SFIPL continued to distinguish between processing

performed for export fittings versus those sold in the home market. In a filing after its fourth

questionnaire response (and after it had asserted that its distinction between different types of

processing only applied to unfinished forgings), SFIPL explained the power costs it incurred for

processing:

- Process-1: Roughing – (see column 't' of Exhibit S2-16(b) Part-2)[5]

---

[5]   Note that this exhibit was attached to SFIPL's 2ⁿᵈ Supplemental Questionnaire Response. *See* APPX09586.  A revised version of SFIPL's power worksheet was included in its sixth questionnaire response.  SFIPL Sixth Supplemental Questionnaire Response at 12

- Process 2: Final Machining/Roughing-2 (see column 'w' of Exhibit S2-16(b) Part-2)

- Process 3: Roughing + Final Machining (See column 'y' of Exhibit S2-16(b) Part-2)

Process-1 refers to machining time for conventional & high speed drilling machines on which drilling process and threading machine on which occasionally threading process is performed. Process 2 refer to machining time for conventional lathe machines on which finishing operations such as drilling, turning, threading, etc. is performed. Process 3 refers to machines time of CNC machines on which all the operations (Drilling, Turning, Threading, etc.) is performed.  Thus with the actual experience SFIPL has calculated the different time required for each product. Thus an item can undergo in either any of above three process or in combination of above three process <u>depending upon the market (domestic or export) where the product is sold</u> and depending upon the availability of machines where the product is produced as per the actual experience of the SFIPL.

SFIPL Rebuttal Comment on Petitioner second and third post preliminary comment at 8-9 (July 13, 2020) (emphasis added) (APPX12136-12137).

Thus, SFIPL's power worksheet reported processing on lathe machines in a different column than the column it reported processing on CNC machines.  Because of this, Petitioners were able to distinguish between parts (CONNUMs) machined solely on conventional lathes from those machined solely on CNC machines.  They were also able to use SFIPL's sales databases to distinguish parts (CONNUMs) sold only in the home market to traders from those that were sold to end-users in the home market and for export. Petitioners included in their case brief their analyses of the spreadsheets and databases that SFIPL filed in the investigation.  They showed the following:

(1) There were [     ] CONNUMS sold [
                              ] *See Pet. CR Case Brief* at Exhibit 2, Report 1(a) (APPX 91629-91640).[6]

---

(APPX89809) ("*SFIPL 6th Sup. QR*"). Petitioners used the latter version for the analyses they presented in their Commerce case brief.

[6]   Note that because SFIPL aggregated its costs by CONNUM, if a particular CONNUM had been sold both to traders and for export, it would, as described by SFIPL, have [
                                                                      ] Thus, for purposes of this analysis

(2) Of the [      ], there were home market sales of [      ] finished fitting CONNUMs made only to traders in the home market to which SFIPL allocated [
                    ] *See Pet. CR Case Brief* at Exhibit 2, Report 1(b) (APPX 91641-91648).

(3) Of the [      ], there were home market sales of [      ] finished fitting CONNUMs made to traders to which SFIPL allocated [                                        ] *See Id.* at Exhibit 2, Report 1(c) (APPX 91649-91654).

(4) No sales of unfinished fittings in the home market were [
                    ] *Id.*

SFIPL explained that it had not machined any fittings sold to traders in the home market on [                ] yet it reported costs for machining on [                ] for many of those same fittings.  Importantly, Commerce's acceptance of SFIPL's cost reporting – despite its inconsistency with SFIPL's other descriptions of its processing operations – permitted SFIPL to shift costs away from CONNUMs that were sold in the U.S. market to CONNUMs sold to certain customers in the home market.

SFIPL's description of the processing it performed during the FORGING stage included these statements:

Heat treatment

. . . In each export materials heat treatment is done to normalize the materials as per require international standards, whereas in domestic it is not done in major case of trader's. However, fittings which are supplied to users or OEMs are normalized by heat treatment.

Physical Test

After heat treatment, Physical / mechanical test of the steel which has gone through forging and heat-treatment process is done. It requires testing the tensile, yield, elongation, impact, hardness etc This testing is performed in each export orders as per require international standards where as in domestic it is not done in major case of trader's Orders however Fittings which are supplied to users or OEM orders are tested.

---

and the next, Petitioners had to limit their scrutiny to CONNUMs sold [

                    ]

Surface Finishing

Forged surface has burnt scalp, uneven surface, which is required to be grinded and shot blasted for better appearance. This finishing process is performed in each export orders where as in domestic it is not done in major case of trader's Orders however Fittings which are supplied to users or OEM orders.

As noted above, SFIPL attempted to explain away the distinctions in the processing of fittings sold to different customers in different markets in its Exhibit 10(a) as distinctions solely between finished and unfinished fittings. *SFIPL 4th Sup. QR* at 1  (APPX8822).  Yet, given this language and the distinctions made between fittings sold in the home market to traders, fittings sold in the home market to end users or OEMs, and fittings sold for export, it was not logical for Commerce to accept the original language as simply a mistake and that all of the distinctions made were really between unfinished and finished fittings.  In essence, SFIPL asked Commerce to believe that what it meant to say was:

Heat treatment

. . . In each heat treatment is done to normalize finished fittings but not unfinished fittings.

Physical Test

After heat treatment, Physical / mechanical test of the steel which has gone through forging and heat-treatment process is done. It requires testing the tensile, yield, elongation, impact, hardness etc This testing is performed on finished fittings but not unfinished fittings.

Surface Finishing

Forged surface has burnt scalp, uneven surface, which is required to be grinded and shot blasted for better appearance. This finishing process is performed on finished fittings but not unfinished fittings.

Mistaken reporting cannot explain how SFIPL's distinctions between finished and unfinished fittings were transformed into distinctions between fittings sold to different types of customers and markets.

While SFIPL's "explanation" could possibly be accepted by Commerce as addressing the heat treatment process included in Stage 1 FORGING [7] it had no relevance to the Stage 2 MACHINING processing steps: unfinished fittings were not machined.  SFIPL made this clear in its rebuttal brief:

> The item is unfinished fitting as indicated in item description word "Forging"
> . . . as we know unfinished fitting does not require any machining process.

And:

> . . . all product description (see column "a") that contain the word [          ] in
> their product description are unfinished product and accordingly all such products
> in working have been identified as "forged" (see column "r" of Exhibit S5-6 Part
> 2 and in all such items no process cost was allocated for any process (see column
> "s" to "z6") except cutting process which is required for un-finished fitting.

*SFIPL Rebuttal Brief* at 23 (APPX91786).


This language was included in the description of processing for the MACHINING stage:

> In process of Machining there is major difference in Domestic trader's order and
> export orders. There will be no boring after drilling and socket preparation will be
> done in conventional laths in domestic orders.  However in export orders each
> fittings will be machined 100% Boring and end preparation with CNC Machines.

*SFIPL Sec. A QR* at Exhibit A-10(a) (APPX3638).

This language indicates that different processing was performed on finished fittings for domestic trader's orders and finished fittings for export: the latter are not bored and the socket preparation performed on them is done on conventional lathes while the boring and end preparation for export fittings is done entirely on CNC machines.

This distinction in the second stage of processing (MACHINING) could only be between finished fittings as it had to do with the <u>finishing</u> performed on the fittings and, as SFIPL has said, no finishing was performed on unfinished fittings.  Consider the relevant language in

---

[7]   Petitioners do not believe that it can.

SFIPL's description of its processing if we include the words "unfinished forged fitting" in the

manner asserted by SFIPL:

> In process of Machining there is major difference in Domestic trader's order *for unfinished forged fittings* and export orders. There will be no boring after drilling and socket preparation will be done in conventional laths in domestic orders *for unfinished forged fittings*.  However in export orders each fittings will be machined 100% Boring and end preparation with CNC Machines.

This is the reading advocated by SFIPL and accepted by Commerce as the grounds for

rejecting Petitioners' analysis.  As this text revised per SFIPL's explanation shows, the changes

render the statements complete nonsense.  As SFIPL has repeatedly asserted that its unfinished

forged fittings were not machined, a statement that such fittings were machined on conventional

lathe machines makes no sense whatsoever.  While SFIPL's emendation of its Exhibit A-10(a)

questionnaire response may be plausible when applied to the FORGING PROCESS stage of

processing,[8] it clearly is not plausible when applied to the machining stage.

### 4. Commerce's Determination

In this investigation, Commerce accepted SFIPL's reporting as consistent and as

reasonably reflecting the costs associated with its production.  As Petitioners demonstrated in

their case brief, there are at least two different ways in which substantial evidence did not

support Commerce's conclusions: (1) CNC machine finishing costs were reported for [

];

and (2) CNC machining costs were not reported [

].  *See* Petitioners' Case Brief at 9-13

(APPX91578-91582). Thus, Petitioners were able to demonstrate that SFIPL's description of its

processing and its actual reporting were not consistent and should have been rejected by

---

[8]  Petitioners do not accept that it does.

Commerce in favor of the application of adverse facts available, or at least a requirement that SFIPL correct the misinformation. *Id.* at 12-17 (APPX91581-91586) and at 18-19 (APPX91587-91588).

Commerce's acceptance of SFIPL's distinction between processing performed on unfinished versus finished fittings as a sufficient explanation of the different processing identified for finished fittings alone was illogical and so not supported by substantial evidence. As Petitioners also noted above, the movement of costs away from sales that would match with U.S. sales resulted in a lower, and less accurate, dumping margin for SFIPL. *See Hung Vuong Corp. v. United States*, Slip Op. 20-174 at 85 (Ct. Int'l Trade Dec. 3, 2020) ("This matters because understated factors of production would result in a product having a lower normal value and, by extension, lower dumping margins.").

Commerce is obligated to "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Tianjin Magnesium Int'l Co. v. United States,* 34 CIT 980,982, 722 F.Supp.2d 1322, 1328 (2010) (*quoting Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, (1983)).[9] Commerce failed to do so here. Petitioners presented the facts of record showing both of the inconsistencies discussed above.  Commerce's choices in its final determination ignored these inconsistencies, and so its determination was not supported by substantial evidence.

---

[9]    In other cases, Commerce has not hesitated to adjust a respondent's costs when it finds that the respondent has moved costs away from subject merchandise.  *See, e.g., Thai Plastic Bags Industries Co. v. United States*, 853 F.Supp.2d 1267, 1273 (2012) ("Commerce adjusted a respondent's costs to reflect Plaintiff's reported per-unit costs shifted costs away from the subject merchandise, and thus Commerce reasonably recalculated Plaintiff's costs by averaging them in order to prevent large discrepancies in costs between merchandise that was physically similar.")

NON-CONFIDENTIAL VERSION

This Court should remand this action to Commerce with instructions that it consider the record as a whole, including the evidence identified by Petitioners in their case brief, that significantly detracted from the reliability of SFIPL's cost reporting. *See Nippon Steel Com. v. United States*, 337 F.3d at 1379 (Fed. Cir. 2003) (*citing Atl. Sugar, Ltd, v. United States.* 744 F.2d 1556, 1562 (Fed. Cir. 1984)).

## VI.    CONCLUSION

Petitioners ask this Court to find that Commerce erred as a matter of law by not verifying SFIPL's questionnaire responses and that Commerce's reliance on SFIPL's reporting of processing costs was not supported by substantial evidence.  We ask that the Court remand with instructions that Commerce verify SFIPL's responses and re-consider its reliance on SFIPL's reporting of processing costs.

Respectfully submitted,

/s/ William Fennell

Roger B. Schagrin
William A. Fennell
SCHAGRIN ASSOCIATES
900 Seventh Street NW
Washington, D.C. 20001
(202) 223-1700
*Counsel for Bonney Forge
Corporation, And United Steel,
Paper and Forestry, Rubber,
Manufacturing, Energy, Allied
Industrial and Service Workers
International Union*

NON-CONFIDENTIAL VERSION

## WORD COUNT CERTIFICATE OF COMPLIANCE

In accordance with the Chambers Procedures of the United States Court of International Trade, the undersigned certifies that his brief complies with the word limitations set forth in the Chambers Procedures. Specifically, excluding those exempted portions of the brief, as set forth in 2 B (1) of the Chambers Procedures, I hereby certify that this brief contains 7773 words. In accordance with the Chambers Procedures, this certified word count is based on the word count feature in the word processing system (Microsoft Word) used to prepare this brief.

/s/ William Fennell
William Fennell