NON-CONFIDENTIAL VERSION

## UNITED STATES COURT OF INTERNATIONAL TRADE

### BEFORE: THE HONORABLE STEPHEN A. VADEN, JUDGE

BONNEY FORGE CORPORATION, and
UNITED STEEL, PAPER AND FORESTRY,
RUBBER, MANUFACTURING, ENERGY,
ALLIED INDUSTRIAL AND SERVICE
WORKERS INTERNATIONAL UNION,

Plaintiffs,

v.

UNITED STATES,

Defendant, and

SHAKTI FORGE INDUSTRIES PVT. LTD,

Defendant-Intervenor.

.

**Ct. No. 20-03837**

**NON-CONFIDENTIAL VERSION**

### PLAINTIFFS' REPLY BRIEF IN SUPPORT OF RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD

Roger B. Schagrin
Elizabeth J. Drake
William A. Fennell
SCHAGRIN ASSOCIATES
900 Seventh Street NW
Washington, D.C. 20001
(202) 223-1700

*Counsel for Bonney Forge Corporation
and the United Steel, Paper and Forestry,
Rubber, Manufacturing, Energy, Allied
Industrial and Service Workers
International Union*

Dated:  July 22, 2021

NON-CONFIDENTIAL VERSION

TABLE OF CONTENTS

I.      INTRODUCTION ..................................................................................................1

II.     THE COMMERCE DEPARTMENT ERRED AS A MATTER OF LAW BY
        NOT MEETING ITS OBLIGATION TO VERIFY THE INFORMATION OF
        RESPONDENT SFIPL. ..........................................................................................1

        A.      Commerce's Collection of Information in This Proceeding Did Not
                Constitute Verification. ..............................................................................1

        B.      Commerce's Arguments..............................................................................2

                1. Petitioners Clearly Raised the Verification Issue in their Case Brief and
                   Thereby Exhausted their Administrative Remedies. ...............................2

                2. The Facts Available Provisions Do Not Excuse Commerce from its
                   Duty to Verify, and They Only Permit Commerce to Rely on
                   Information Otherwise Available When It Cannot Verify Information of
                   Record. .....................................................................................................3

                3. Commerce Did Not Achieve the Goals of Verification..........................6

        C.      SFIPL's Arguments. ...................................................................................9

                1. Commerce's Questions in its Later Questionnaires Are Similar to Those
                   Asked in its Earlier Questionnaires. .......................................................9

                2. The Issue Is Not a Semantic Issue But a Legal One. ...........................11

                3. Commerce Failed to Undertake the Steps Required to Confirm the
                   Accuracy of SFIPL's Information. ........................................................12

        D.      Conclusion................................................................................................12

III.    COMMERCE'S ACCEPTANCE OF SFIPL'S FACTOR REPORTING AS
        ACCURATE WAS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE. ......13

        A.      SFIPL's Actual Cost Reporting Was Not Consistent with its Explanation of
                that Reporting. ..........................................................................................13

        B.      Commerce's Arguments............................................................................13

                1. Commerce Has Ignored the Record as a Whole. ...................................13

        C.      SFIPL's Arguments ..................................................................................17

                1. SFIPL Ignores the Fact that Small Changes Can Have Significant
                   Effects. ....................................................................................................17

                2. SFIPL's Assertion of Split Finish Processing Is Not Supported by the
                   Record......................................................................................................18

NON-CONFIDENTIAL VERSION

3. Petitioners Correctly Identified Fittings for which SFIPL Reported CNC Finish Processing Costs. ........................................................................22

IV.    CONCLUSION....................................................................................................23

NON-CONFIDENTIAL VERSION

TABLE OF AUTHORITIES

## Cases

*Bomont Indus. v. United States*, 14 CIT 208, 733 F.Supp. 1507 (1990) ........................... 8

*Canadian Solar Int'l Ltd. v. United States,* 43 CIT __, 399 F.Supp.3d 1379 (2019)........ 23

*Carpenter Tech. Corp. v. United States*, 30 CIT 1373, 452 F. Supp. 2d 1344  (2006) ...... 2

*Hung Vuong Corp. v. United States*, 44 CIT __, 483 F.Supp.3d 1321 (2020) .................. 5

*Mannesmannrohren–Werke AG v. United States*, 23 C.I.T. 826, 77 F.Supp. 2d 1302
   (1999). .......................................................................................................................... 6

*Micron Tech. Inc. v. United States*, 117 F. 3d 1386 (Fed. Cir. 1997) ........................... 9

*Shenzhen Xinboda Industrial Co., Ltd., v. United States*, 41 CIT __, 279 F.Supp.3d 1265
   (2017) ............................................................................................................................ 7

*Since Hardware (Guangzhou) Co., Ltd. v. United States*, 35 CIT 1670 (2011) ............. 8, 9

*Timken Co. v. United States,* 26 CIT 434, 201 F. Supp. 2d 1316 (2002) ........................... 2

*Zhejiang Sanhua Co., Ltd. v. United States*, 39 CIT __,  61 F.Supp.3d 1350, (2015)........ 5

## Statutes

19 U.S.C. § 1677e(a)(2)(D) ................................................................................................. 3

19 U.S.C. § 1677m(i)(1) ................................................................................................. 3, 4

## Other Authorities

A N. Singer & S. Singer, Sutherland on Statutory Construction (7th ed. 2014) ............... 6

Statement of Administrative Action accompanying the Uruguay Round Agreements Act,
   H.R. Doc. 103–(1994), *reprinted in* 1994 U.S.C.C.A.N. 4040 ..................................... 4

## Regulations

19 C.F.R. § 351.307(c)......................................................................................................... 8

## Administrative Determinations

*Forged Steel Fittings from India and Korea*, USITC Pub. 5137, Inv. Nos. 701-TA-631
   and 731-TA-1463-1464 (Nov. 2020)......................................................................... 21

Issues and Decision Memorandum for the Final Determination in the Less-Than-Fair-
   Value Investigation of Carbon and Alloy Steel Threaded Rod from the People's
   Republic of China (Feb 7, 2020)....................................................................................... 6

NON-CONFIDENTIAL VERSION

## I.      INTRODUCTION

Plaintiffs Bonney Forge Corporation ("Bonney Forge") and the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union ("the USW") provide their reply to the response briefs of Defendant United States Commerce Department ("Commerce") and Defendant-Intervenor, Shakti Forge Industries Pvt. Ltd ("SFIPL").  Commerce and SFIPL assert their positions that (1) by sending out some supplemental questionnaires Commerce verified SFIPL's information and (2) that SFIPL's distinction between different processing for finished and unfinished fittings explains the distinctions it made between different processing for finished fittings.

Petitioners have addressed these arguments in their 56.2 brief but here provide specific responses to those arguments as presented.

## II.     THE COMMERCE DEPARTMENT ERRED AS A MATTER OF LAW BY NOT MEETING ITS OBLIGATION TO VERIFY THE INFORMATION OF RESPONDENT SFIPL.

### A.      Commerce's Collection of Information in This Proceeding Did Not Constitute Verification.

Petitioners have laid out the salient elements of Commerce's failure to verify in their 56.2 brief: in sum, Commerce did not undertake the actions necessary to determine the accuracy of the information that it obtained from SFIPL, nor did it provide a verification report summarizing its analysis and assessment of the accuracy of Shakti's information.  *See* Petitioners' 56.2 Memorandum in Support of their Motion for Judgment on the Record (April 26, 2021) ("Petitioner's 56.2 Brief") at 8-13 (ECF No. 23). In response, Commerce has presented a number

1

of arguments that do not excuse Commerce's legal error in failing to verify.  Petitioners address them sequentially.

**B.    Commerce's Arguments**

1. Petitioners Clearly Raised the Verification Issue in their Case Brief and Thereby Exhausted their Administrative Remedies.

Commerce first argues that although Petitioners urged Commerce to undertake virtual verification in their case brief, they did not raise any challenge to Commerce's decision not to verify. Commerce Response Brief (July 2, 2021) (ECF No. 35) at 9.  In their case brief at pages 19-20, Petitioners noted Commerce's memo indicating that it could not conduct a normal verification of SFIPL's data, that information of record remained unverified, and asked Commerce to conduct a virtual verification (APPX91588-91589).  In an investigation, parties identify in their case briefs the issues that warrant action by Commerce its final determination. As this Court has noted in one of the cases cited by Commerce, "plaintiff's brief statement of the argument is sufficient if it alerts the agency to the argument with reasonable clarity and avails the agency with an opportunity to address it." *Timken Co. v. United States,* 26 CIT 434, 460, 201 F. Supp. 2d 1316, 1340-41 (2002).

The exhaustion requirement "is generally appropriate in the antidumping context because it allows the agency to apply its expertise, rectify administrative mistakes, and compile a record adequate for judicial review-advancing the twin purposes of protecting administrative agency authority and promoting judicial efficiency." *Carpenter Tech. Corp. v. United States*, 30 CIT 1373, 1374–75, 452 F. Supp. 2d 1344, 1346 (2006).  In this case, Petitioners urged Commerce to undertake a virtual verification, and Commerce was on notice that it should undertake a form of verification of SFIPL's information.  It could have undertaken such a verification in the more

2

than two months following the filing of case briefs (Aug. 11, 2020 APPX91567) and its final determination (Oct. 13, 2020 APPX14156), applied its expertise, and compiled a record adequate for judicial review.  This Court should reject Commerce's exhaustion argument.

### 2. The Facts Available Provisions Do Not Excuse Commerce from its Duty to Verify, and They Only Permit Commerce to Rely on Information <u>Otherwise</u> Available When It Cannot Verify Information of Record.

Commerce next presents a novel statutory interpretation at pages 9-14 of its Response Brief.  It asserts that the statutory requirement that Commerce verify information it relies on for its final determination (19 U.S.C. § 1677m(i)(1)) must be read in harmony with that permitting Commerce to use facts otherwise available when it cannot verify information (19 U.S.C. § 1677e(a)(2)(D)).  But the agency's "harmonious" reading produces absurd results. Essentially, Commerce argues that the provision permitting reliance on facts available constitutes an "exception" to the provision that requires Commerce to verify a respondent's information in an investigation. Commerce Response Brief at 10. This reading defies common sense. If Commerce's interpretation is correct, the agency could deem itself unable to adequately verify a respondent's information by traditional means and then reward the respondent by relying on facts available.

Commerce's reading also does not comport with legislative history. In the only specific description of an inability to verify, the Statement of Administrative Action accompanying the Uruguay Round Agreements Act, which added section 1677e(a)(2)(D), states as follows:

> Consistent with current practice, if the foreign government concerned or the person whose information is to be verified objects to verification, Commerce will not conduct the verification and may disregard the submitted information in favor of the facts available, pursuant to amended section 776(a)(4).

H.R. Doc. 103–316 at 868 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4197. The SAA further

describes the purpose of the provisions on facts available (previously referred to as best

information available, or "BIA") as follows:

> Commerce's potential use of BIA provides the only incentive to foreign exporters
> and producers to respond to Commerce questionnaires …. The Agreements
> largely track current law, but use different terminology. If an interested party does
> not provide necessary information or significantly impedes an investigation,
> authorities may make determinations on the basis of the 'facts available.'

*Id*. at 868-69, 4198. In short, the facts available provision is intended to give Commerce

flexibility where a respondent refuses to permit verification or provides information that is

unverifiable – *i.e.*, information that fails the verification that Commerce is required to perform

under 19 U.S.C. § 1677m(i)(1). The provision therefore also provides an incentive for

respondents to not only respond to Commerce's information requests, but to respond with

information that is accurate and can withstand the required verification. The facts available

provision is triggered by a failure or lack of cooperation on the part of <u>respondents</u>; it is not

intended to excuse <u>Commerce</u> from conducting its investigative duties. Commerce dismisses this

distinction in a footnote and argues the issue need not be resolved by this Court, Commerce

Response Brief at 11 n.1, but the question goes to the heart of Commerce's argument, and the

legislative history demonstrates exactly why Commerce's interpretation is so flawed.

The facts available provision serves to create consequences for uncooperative

respondents and thus ensure compliance with Commerce investigations. The provision was not

intended to give Commerce a loophole when on-site verification proves too difficult, thus

absolving the agency of its duty to conduct any kind of verification at all.

Consistent with Congressional intent, Commerce has previously relied on the facts

available provision regarding verification only where respondents were responsible for failing to

provide verifiable information. *See, e.g., Zhejiang Sanhua Co., Ltd. v. United States*, 39 CIT __,

__, 61 F.Supp.3d 1350, 1355-56 (2015) (sustaining use of facts available where Commerce

found at verification that respondent's scrap reporting methodology was inaccurate); *Hung*

*Vuong Corp. v. United States*, 44 CIT __, __, 483 F.Supp.3d 1321, 1345-49 (2020) (affirming

reliance on facts available when respondent was discovered to have not retained source

documents requested at verification). As far as Petitioners are aware, Commerce has not

previously relied on the facts available provision to justify its own decision not to conduct

verification where respondents were otherwise cooperative prior to that verification. As reviewed

above, Commerce's convoluted interpretation defies logic and contravenes legislative intent, and

this Court should therefore decline to follow it.

   In addition, Commerce's interpretation impermissibly misconstrues the language of the

facts available provision itself. Commerce asserts that 19 U.S.C. §§ 1677e(a)(2)(D) and

1677m(i)(1), when read "harmoniously," allowed the agency to use the information of record

when it cannot verify that the same information is verifiable. Commerce Response Brief at 11.

This ignores the clear language of the facts available provision, which states Commerce, in the

event of an inability to verify, may only resort to "information otherwise available."  As this

Court has said: "Pursuant to 19 U.S.C. § 1677e(a)(2)(D) and § 1677m(e)(2) (1994), Commerce

may <u>disregard</u> information submitted by a party that cannot be verified and <u>substitute</u> facts

available." *Mannesmannrohren–Werke AG v. United States*, 23 C.I.T. 826, 849, 77 F.Supp. 2d

1302, 1321 (1999) (emphasis added).

   In its *Final IDM*, Commerce asserted that, as it could not verify certain information, it

was relying on information otherwise available, "the record information used in the Preliminary

Determination (and further developed in responses to subsequent questionnaires)." Decision

Memorandum for the Final Determination in the Less-Than-Fair-Value Investigation of Forged

Steel Fittings from India ("*Final IDM*") (Oct. 13, 2020) at 3  (APPX14126-14148).  Commerce's

error is that it did not discard the information that it could not verify, SFIPL's questionnaire

responses, but instead used those unverified responses as information otherwise available. This is

an incorrect interpretation of these statutory provisions that would allow Commerce to rely on

whatever unverified information it chooses as "facts available."  Unverified facts from a

respondent's responses cannot, by definition, be facts that are "otherwise" available when the

verification of those same responses fails.

This Court has explained that "{i}t is an elementary rule of construction that effect must

be given, if possible, to every word, clause and sentence of a statute;" that "{c}ourts construe a

statute to give effect to all its provisions, so that no part is inoperative or superfluous, void, or

insignificant;" and that "{c}ourts assume that every word, phrase, and clause . . . is intended and

has some meaning." *Shenzhen Xinboda Industrial Co., Ltd., v. United States*, 41 CIT __, __, 279

F.Supp.3d 1265, 1307-08 (2017), *quoting* A N. Singer & S. Singer, Sutherland on Statutory

Construction § 46.6 (7th ed. 2014) (footnotes omitted).  Commerce's interpretation that it may

rely on the very information that could not be verified as "facts available" would nullify the

verification requirement of § 1677m(i)(1).  If Commerce can rely on any information that has not

been verified, what is the point of requiring verification?  Moreover, the record below is not

information "otherwise available" – it is specifically the information that Commerce chose not to

verify. Commerce has misread the statute, and this Court should remand on this basis alone.

### 3. Commerce Did Not Achieve the Goals of Verification.

Commerce then states that "although Commerce could not conduct verification, . . . the

goals cited by plaintiffs, such as testing for accuracy and completeness and providing basic

6

fairness through opportunity to review and comment on responses . . . was provided to the best of Commerce's ability considering the circumstances."  Commerce Response Brief at 14. In fact, Commerce did not achieve those goals.

Commerce asserts that because it collected extensive amounts of information, it achieved the goals of verification.  *Id.* If the collection of extensive amounts of information were alone sufficient to (a) confirm the accuracy and completeness of a respondent's questionnaires and (b) provide sufficient opportunity to review and comment thereon, there would be no need for verification.  "Verification is the process by which Commerce confirms the truth and accuracy of information and materials in a respondent's questionnaires." *Since Hardware (Guangzhou) Co., Ltd. v. United States*, 35 CIT 1670, 1679-80 (2011) (citing *Bomont Indus. v. United States*, 14 CIT 208, 209, 733 F.Supp. 1507, 1508 (1990) ("Verification is like an audit, the purpose of which is to test information provided by a party for accuracy and completeness.")).

A greater quantity of information provides a greater opportunity to determine the internal consistency of the information, but it does not provide the opportunity for verifying the accuracy of the information that trained analysts focused on assessing that accuracy during verification sessions can provide.  During verification, Commerce's team requires a respondent's representatives to show them information that will confirm the accuracy of information provided in questionnaire responses and make spontaneous inquiries that will confirm (or not) the accuracy of that information.

The Federal Circuit has described the steps undertaken by Commerce to verify a particular element of a respondent's reporting, *i.e.*, verification. Commerce:

> 1. Reviewed summaries of adjustments made to depreciation expense....
>
> 2. Performed reasonableness tests of depreciation summaries.

3. Reviewed depreciation summary for 1991 and 1992. Noted significant decrease in depreciation expense for machinery and equipment in Fab line 2. Noted that production remained constant during this time.

4. Traced depreciation amounts and the recorded values for machinery and equipment in Fab 3 to fixed asset ledger as of 4/30/92.

5. Traced adjusted depreciation amounts for January 1992 to the worksheets used to prepare cost information....

6. Tested asset value for the clean room and structure related to Fab 3, constructed by a related company {Hyundai Engineering and Construction Company} to determine if the value represented a fair market value greater than the cost of production. Noted that amounts recorded by HEI did not include any costs related {to} the general expenses or interest expenses of {Hyundai Engineering}....

*Micron Tech. Inc. v. United States*, 117 F. 3d 1386, 1397-98 (Fed. Cir. 1997).

This short description of a single verification element demonstrates some of the steps that verifiers will undertake including: testing values for reasonableness, assessing values over time, tracing values to accounting materials, tying accounting information to worksheets used to prepare reported (cost) information, assessing whether reported values represented market values, and identifying missing information. A virtual verification would have allowed Commerce's analysts and economists to undertake this kind of probative analysis on the different elements of SFIPL's questionnaire responses. It would have allowed Commerce to make an assessment of accuracy and completeness that an assembly of questionnaire responses cannot achieve.

Nor did Commerce prepare a verification report. "Pursuant to 19 C.F.R. § 351.307(c), whenever Commerce conducts verification, it is required to prepare a verification report, which must contain 'the methods, procedures, and results of verification.'" *Since Hardware (Guangzhou) Co., Ltd. v. United States*, 35 CIT at 1680. The assembly of a verification report

8

requires Commerce staff to engage in a focused review of existing information, describe the analysis undertaken, and articulate their findings.  The resulting report provides an opportunity for interested parties to consider Commerce's assessments and comment thereon.  Commerce did not verify SFIPL's information and report its findings.  The verification goals of assessing accuracy and completeness and of providing review by interested parties of those assessments were not achieved in this proceeding. Indeed, Commerce did not even address its failure to meet this regulatory requirement in its response brief.

For all of these reasons, this Court should find Commerce's failure to verify SFIPL's responses contrary to law and remand this proceeding for Commerce to at least conduct a virtual verification to confirm the accuracy of SFIRL's responses.

### C.     SFIPL's Arguments.

#### 1. Commerce's Questions in its Later Questionnaires Are Similar to Those Asked in its Earlier Questionnaires.

SFIPL provides its own testimony (without citations) as to what kinds of questions Commerce asks during verification.  SFIPL Response Brief (ECF No. 37) at 4-7.  SFIPL then identifies questions asked by Commerce in its later supplemental questionnaires (the fifth and the sixth) that match those it asserts are asked during verification.  *Id.* at 4-5.  In fact, Commerce's later questions were very much like its earlier questions.  Commerce obtained additional information but did not subject that information to the scrutiny of verification.  To confirm the similarity of the later questions to those asked earlier in the investigation, Petitioners provide citations to earlier questionnaires:

| SFIPL cited question | Subject | Commerce Question in earlier questionnaire | Question citation item below |
|---|---|---|---|
| (1) 5th Supplemental Response of July 6, 2020 (5SQR) – Question 2 (b) | Monthly consumption and value per month | DOC Sec. D Supp. Questionnaire p. 4 Q. 7a (Mar. 31, 2020) | A |
| (2) 5th Supplemental Response of July 6, 2020 (5SQR) – Question 2 (c) | Closing inventories | DOC Sec. D Supp. Questionnaire p. 9 Q. 25 (Mar. 31, 2020) | B |
| (3) 6th Supplemental Response of July 23, 2020 (6SQR) – Question 4 | Theoretical weight calculation | DOC Sec. A-C Supp. pp. 4-5 (April 10, 2020) | C |
| (4) 6th Supplemental Response of July 23, 2020 (6SQR) – Question 5 | Sales documentation | DOC Original questionnaire p. A-9, Q. 4d (Jan. 2, 2020) | D |
| (5) 6th Supplemental Response of July 23, 2020 (6SQR) – Question 5 | Account information re product physical characteristics | DOC Original questionnaire p. D-6, Q. C1d (Jan. 2, 2020) | E |

(A) 7a. Provide a monthly raw material inventory movement schedule (i.e., beginning balance, purchases, consumption, sales, other adjustments/transfers, and ending balance) for the FY 2019 and the POI showing the quantities and value per type (i.e. billet, bar and other steel type) and per grade/specification (i.e. A-105, A-350, A 182). APPX6054.

(B) 25. At Exhibit D-23 of the section D response, you provided the inventory movement of the subject merchandise. Provide an inventory movement schedule of the finished goods inventory that includes subject and non-subject merchandise for the FY 2019 and for the POI. Demonstrate the tie up to the ending amount inventory account in the FY 2019 audited financial statements. APPX6059.

(C) 11c. Explain how you calculated the theoretical weight per piece, along with the formula you used to derive the weights.
d. For each fitting you have reported in your home market or US databases, provide the values of all of the parameters including material density that have been used with the AUTOCAD software to produce its weight calculation.
e. Explain how you have confirmed that the AUTOCAD software produces accurate weights.
f. For the five largest-volume CONNUMs sold in the US and home markets during the POI, provide supporting documentation for the theoretical-weight calculation. APPX8111-8112.

(D) 4d. Describe your agreement(s) for sales in the United States and the foreign market (*e.g.*, long-term purchase contract, short-term purchase contract, purchase order, order

confirmation). Provide a copy of each type of agreement and all sales related documentation generated in the sales process (including the purchase order, internal and external order confirmation, invoice, and shipping and export documentation) for a sample sale in the foreign market and U.S. market during the POI. APPX2930.

(E) C1d. Explain how your normal cost accounting system accounts for each of the physical characteristics identified for this proceeding. APPX3011.

The significant difference between questions asked in initial questionnaires and for verification is that during verification, Commerce has the opportunity to query any of the information items presented during verification, obtain an explanation for it, and obtain any supporting information that appears relevant.  Verification team members make judgments, *inter alia*, about the reasonableness of reported information, compare reported information to accounting records, and tie worksheets underlying reported information to company records. Commerce also reports its assessment of the information and supporting documentation in a verification report.  As discussed below, the issue is not one of quantity but of quality. Commerce collects information throughout an investigation; it refines its questions and seeks information not yet on the record.  Verification requires an assessment of that information for accuracy and completeness. That verification did not occur here.

**2. The Issue Is Not a Semantic Issue But a Legal One.**

SFIPL asserts that the information collection in this investigation is similar to that in other investigations (citing in footnote 4 to a document in another proceeding that is not on this record). SFIPL Response Brief at 6.  It then concludes that Petitioners' argument must be a semantic one, based on the fact that Commerce identified its questionnaires in this proceeding as "supplemental" rather than "in-lieu of verification." *Id.*  Commerce's actions in the cited proceeding are not before this Court.  Petitioners have identified a statutory requirement that

Commerce undertake verification. The record shows that Commerce did not take the steps necessary to verify the information in this record. This failure to act constitutes reversible legal error.

### 3. Commerce Failed to Undertake the Steps Required to Confirm the Accuracy of SFIPL's Information.

SFIPL concludes its argument on this issue by quoting with emphasis Commerce's IDM statement that "Shakti provided 1,998 pages of information and documentation, most of which consisted of the type of corroborating documentation from Shakti's normal books and records that Commerce typically examines at verification (e.g., ledgers, invoices, mechanical drawings and specifications, etc.)." SFIPL Response Brief at 6. As Petitioners have reviewed, Commerce is engaged in an effort throughout an investigation to collect substantive information that will allow it to determine a dumping margin. It also collects, on an ongoing basis, corroborating information that will aid it to determine the accuracy of that information. What Commerce did not undertake in this investigation was the (1) inquiries and immediate collection of documentation that would allow it to probe for accuracy and (2) the assessment necessary to produce a report that lays out its inquiries and the factual information leading to its verification findings.

### D.     Conclusion

Neither Commerce nor SFIPL has identified any qualitative steps undertaken by Commerce to verify SFIPL's information. This Court should remand with instructions to Commerce to undertake a verification and to provide the parties with a verification report for them to review and comment on.

**III.    COMMERCE'S ACCEPTANCE OF SFIPL'S FACTOR REPORTING AS ACCURATE WAS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE.**

**A.    SFIPL's Actual Cost Reporting Was Not Consistent with its Explanation of that Reporting.**

As Petitioners have demonstrated in their 56.2 Brief (at 15-20), Commerce's determination that SFIPL accurately reported processing costs was not supported by substantial evidence. As Petitioners demonstrated during the investigation, SFIPL reported finishing costs on CNC machines for the fittings that it sold to [                        ].  This reporting was contrary to SFIPL's narrative description of its manufacturing processes, the narrative in which SFIPL stated that it performed CNC machine finishing for fittings sold in the United States but not for fittings sold to traders in the home market.  *See* Petitioners' 56.2 Memorandum in Support of their Motion for Judgment on the Record at 13-25 (April 26, 2021).  In response, the defendant Commerce and respondent SFIPL have presented a number of arguments that do not detract from the conclusion that Commerce's acceptance of SFIPL's cost reporting was not supported by substantial evidence.

**B.    Commerce's Arguments**

**1. Commerce Has Ignored the Record as a Whole.**

Commerce concludes its discussion of the substantial evidence issue by asserting that it "considered the entirety" of the evidence and so substantial evidence supports its "determination to accept the cost databases of Shakti."  Commerce Response Brief at 19.  In fact, it is only by ignoring certain elements of the record that Commerce is able to accept SFIPL's reporting as accurate.

*a) Commerce ignores SFIPL's Description of its Machine Processing.*

First, Commerce refers twice in its brief to its conclusion that Petitioners did not take into account Shakti's revisions to its initial statements regarding different processing for products sold to traders and those sold for export. *Id.* at 16 and 19. Commerce ignores Petitioners' explanation in their 56.2 brief that SFIPL's revisions did not in any way explain the distinctions SFIPL made regarding the "MACHINING PROCESS & PACKING" steps of processing.

In brief, SFIPL's revisions consisted of asserting that the distinctions it was actually referring to were those between fittings that were not finished and those that were. SFIPL's explanation may explain away differences in the processing performed in the "FORGING" stage of its manufacturing process, such as heat treatment. But the differences between finished and unfinished fittings cannot explain the distinctions explicitly made by SFIPL between the finishing processing performed on finished fittings. *See* Petitioners' 56.2 Brief at 13-14 and 20-23.

Commerce accepted SFIPL's argument that its distinctions between the processing of finished and unfinished fittings were relevant to the distinctions it made between the finish processing performed solely on finished fittings depending on the market of sale. Thereby, Commerce excluded from its consideration of the record as a whole SFIPL's statements that finished fittings sold to traders were processed in a different way from those sold for export. These statements could not be considered "revised" by any of SFIPL's statements regarding unfinished vs. finished fittings.

14

*b) Commerce Misreads SFIPL's Reporting of its Finishing Processes.*

Second, Commerce compounds its acceptance of SFIPL's revision argument by

extending it to SFIPL's explanation of its three types of finish processing.  As Commerce noted

in its brief (at 16-17), SFIPL identified three types of finish processing:

- Process 1: Roughing – (see column 't' of Exhibit S2-16(b) Part-2)

- Process 2: Final Machining/Roughing-2 (see column 'w' of Exhibit S2-16(b) Part-2)

- Process 3: Roughing + Final Machining (See column 'y' of Exhibit S2-16(b) Part-2)
  (AAPX12136)

SFIPL explained these:

> Process-1 refers to machining time for conventional & high speed drilling
> machines on which drilling process and threading machine on which
> occasionally threading process is performed. Process 2 refer to machining time
> for conventional lathe machines on which finishing operations such as drilling,
> turning, threading, etc. is performed. Process 3 refers to machines time of CNC
> machines on which all the operations (Drilling, Turning, Threading, etc.) is
> performed.
>
> Thus with the actual experience SFIPL has calculated the different time
> required for each product. Thus an item can undergo in either any of above
> three process or in combination of above three process <u>depending upon the
> market (domestic or export) where the product is sold</u> and depending upon the
> availability of machines where the product is produced as per the actual
> experience of the SFIPL.   SFIPL Rebuttal Comment on Petitioner second and
> third post preliminary comment at 8-9 (July 13, 2020) APPX12136-12137.

Commerce accepted this explanation as grounds for rejecting Petitioners' claims that

appropriate costs were not allocated to SFIPL's products.  *Final IDM* at 19 (APPX14144).  As

Petitioners explained in their 56.2 brief, Commerce requires respondents to report their costs by

CONNUM.  Petitioners' 56.2 Brief at 4-5.  Petitioners accept that SFIPL could report costs for a

particular CONNUM that included costs attributable to one or all three of these processes

because a particular CONNUM may have been sold both in the home market and for export.  If

15

that were the case, SFIPL could well have made some of the fittings identified by a particular CONNUM using each of the three processes.

However, if a particular fitting were sold only to traders, consistent with SFIPL's explanation that finished fittings sold to traders were not processed using CNC machines, it would have been finished using Process 1 or Process 2 depending on the availability of machinery, but not by the CNC Process, Process 3.

As SFIPL said: "Thus an item can undergo in either any of above three process or in combination of above three process depending upon the market (domestic or export) where the product is sold and depending upon the availability of machines where the product is produced." APPX12137.  This statement identifies two elements that may affect the choice of one of the three processes: (1) the availability of machines and (2) the market for sale.  Petitioners' 56.2 Brief at 19.

As fittings for sale to a trader in the home market could be processed either via Process 1 or by Process 2, the machine availability element is met.  However, only by accepting SFIPL's earlier statements that finishing was performed in different ways for different markets, could Commerce give a complete reading to SFIPL's market of sale limitation. Yet, Commerce's reading that finishing may be performed using any of the three processes regardless of the sales market ignores SFIPL's second condition that processing depends on the market.  Thus, under Commerce's reading, the market element is ignored.  No distinction between processes is made based on the market of sale.

Thus, in order to determine that SFIPL's cost reporting was supported by substantial evidence, Commerce had to ignore two significant elements of that reporting: (1) the original distinctions that SFIPL drew between the processing of finished fittings depending on the market

of sale, and (2) SFIPL's later distinction between the three different processing times it reported depending on the market of sale.

### C.    SFIPL's Arguments

SFIPL asserts that the quantity of sales identified by Petitioners as having incorrect processing costs is insignificant; then, relying on facts not of record, it asserts that some fittings sold in the home market could have been drilled and threaded on CNC but then finished on conventional machines.  As Petitioners review below, these arguments are not relevant and result in admissions that SFIPL performed finish processing differently on fittings destined for different markets and that it has reported finish processing costs inaccurately.

### 1. SFIPL Ignores the Fact that Small Changes Can Have Significant Effects.

SFIPL first asserts that Petitioners' analysis pertains to CNC machining the impact of which is "negligible and insignificant." SFIPL Response Brief at 7.  SFIPL's argument is specious in two ways.  First, because a particular CONNUM may be sold in both markets (domestic and export), Petitioners limited their analysis of SFIPL's reporting of finish processing to those CONNUMs that were sold [                    ] in the home market.  *See* Petitioners' 56.2 Brief at 19-20 n.6.   However, SFIPL may also have reported CNC finishing costs for those quantities of CONNUMs [                                        ].  Because Petitioners had to limit their analysis to CONNUMs sold [                ], it did not have the information necessary to confirm that the problems identified extended to the entirety of SFIPL's cost reporting.

Second, even small changes can have significant effects on dumping margins.  By incorrectly attributing cost amounts to one CONNUM that are more accurately attributable to

another CONNUM, a respondent could affect which CONNUMs are determined to be sold in the home market at prices below cost.  U.S. sales that would otherwise be matched to one CONNUM will be matched to home market sales of another CONNUM for purposes of determining dumping.  This could have a significant effect on Commerce's determination of an overall dumping margin.

Petitioners note that SFIPL represents that it has calculated the percentage of total costs represented by the finishing cost for the CONNUM identified as problematic and refers to Exhibit R-1 for a demonstration of its calculation. SFIPL Response Brief at 7.  Petitioners have been unable to find Exhibit R-1.

### 2. SFIPL's Assertion of Split Finish Processing Is Not Supported by the Record.

SFIPL provides new information not on the record below to assert that for some finished fittings sold in the home market the processes of "drilling" and "threading" were performed on CNC machines while the additional steps of boring, socket preparation/threading and end connection preparation were performed on conventional lathes.  *See* SFIPL Response Brief at 10-14.  SFIPL states:

> Next, unlike other machining processes (i.e. boring & socket preparation) where SFIPL provided the distinction between processes performed on the CNC machine and lathe machine based on market, in the production process flow chart (Exhibit A-10(a)) (APPX3638). SFIPL made no distinction between processing performed for export fittings versus those sold in the home market for "Threading & Drilling" process as stated in Exhibit A-10(a) (APPX3638). In their entire argument Plaintiffs did not consider these two important steps, which resulted in an invalid analysis.

*Id.* at 11.

SFIPL's argument raise a number of issues which we address below.

*a) SFIPL Accepts Petitioners' Position that Finishing Processing on CNC Machines Was Performed on Fittings Sold for Export While That for Fittings Sold to Traders in the Home Market Was Performed on Conventional Lathes.*

First, contrary to Commerce's final determination and its Response Brief, with this argument, SFIPL admits that different finish processing was performed on its fittings based on the market for sale as it explained in Exhibit A-10(a): "other machining processes (i.e. boring & socket preparation) where SFIPL provided the distinction between processes performed on the CNC machine and lathe machine based on market."  SFIPL Response Brief at 11.  In other words, as Petitioners have maintained, the distinction SFIPL drew in the "MACHINE PROCESSING" section of its Exhibit A-10(a) between CNC processing performed on exports and conventional lathe processing performed on fittings sold in the home market to traders remains valid and was not changed by its later statements regarding finished and unfinished fittings.  This admission appears to confirm and support Petitioners' position and should be sufficient to warrant a remand.

*b) The Only Finish Processing Step for Which* SFIPL *Did Not Distinguish Between Sales in Different Markets Was Drilling.*

Second, SFIPL claims that the distinctions in processing that it drew in the "MACHINE PROCESSING" did not apply to the "drilling" and "threading" processing steps.

This is the Exhibit A-10(a) language that SFIPL is referring to:

**Nature of Production Process**

**IV. Drilling**

Drilling is first step of machining process. Forged Steel Fitting has the functionality of fluids passing through it. For the same solid forging / bar stock piece need to be drilled for creating a hole inside as per dimension standard or for the next process required.

NON-CONFIDENTIAL VERSION

### V. Boring & End Connection preparation

After drilling, forged steel fitting's inside bore is turn-machined, then threaded or socket prepared as per design standard. In process of Machining there is major difference in Domestic trader's order and export orders. There will be no boring after drilling and socket preparation will be done in conventional laths in domestic orders. However in export orders each fittings will be machined 100% Boring and end preparation with CNC Machines. APPX3638."

The ITC has explained the difference between threaded and socket ends for fittings:

FS fittings are used in piping systems for oil and gas, in chemical and petrochemical plants, electric power-generating plants, and industrial piping systems for distributing liquids and gases under high pressure or liquids and gases that are corrosive in nature. Fittings connect the pipes that are made to withstand the higher pressures in such systems, and the fittings themselves must also be able to withstand such pressures.

FS fittings typically are produced from steel that meets the ASTM A105 or similar standards. They are connected to pipes (or couplings) either by being threaded or by welding (figure I-1). *Socket-weld fittings* are recommended for connections that require strength and duration. These types of forged fittings have a socket where the connecting pipe has to be sealed and welded (with a fillet-type seal weld) for installation. They are available in sizes up to 4 inches and in pressure ratings from class 3000 to class 6000, and class 9000. Typical applications of socket-weld fittings are:

- Steam

- Explosive fluids or gas

- Acids and toxic fluids

- Long-service or durable installations. . .

Threaded fittings are common for pipeworks—such as water-distribution, fire protection, and cooling systems—which are low-pressure applications, or installations that are not subject to vibration, elongation or bending forces. However, threaded fittings are generally avoided when the temperature of the fluid is subject to consistent variations, as sudden temperature changes would crack the threaded connection between the fitting and the pipe. Threaded fittings are available in sizes up to four inches and in pressure ratings from class 2000 to 3000 and 6000.

*Forged Steel Fittings from India and Korea*, USITC Pub. 5137 at I-12-13, Inv. Nos. 701-TA-631 and 731-TA-1463-1464 (Nov. 2020).

As the ITC explains, the ends of fittings are prepared in two ways: with threads (threading) and with sockets that are to be welded. Both types of preparation are encompassed within the term "end preparation." A careful reading of SFIPL's Exhibit A-10(a) language makes it clear that Process 3 end preparation (including threading) is performed on CNC machines for exports and on conventional lathes for traders in the home market. Thus, the only "Machine Processing" step for which SFIPL does not specify a processing distinction is the drilling step.

> c)  *SFIPL's Descriptions of its Three Finishing Processes Make It Clear that the Drilling Step Was Performed as the First Step of Each.*

SFIPL's new information regarding its processing is not consistent with its reporting during the investigation. As Petitioners have reviewed above, SFIPL identified three different processing methods and reported the steps undertaken for each, including drilling:

> Process-1 refers to machining time for conventional & high speed drilling machines on which drilling process and threading machine on which occasionally threading process is performed. Process 2 refer to machining time for conventional lathe machines on which finishing operations such as drilling, turning, threading, etc. is performed. Process 3 refers to machines time of CNC machines on which all the operations (Drilling, Turning, Threading, etc.) is performed. APPX12136-12137.

Each of the three types of processing that SFIPL reported on included a drilling step. SFIPL's assertion that it drilled trader fittings on CNC machines and then moved them to other machines for the rest of the processing steps is not consistent with these descriptions. Moreover, this Court should not accept new factual information in cases based on an administrative record. "A court will not consider matters outside of that administrative record, unless the omission

prevents effective judicial review." *Canadian Solar International Ltd. v. United States,* 43 CIT

__, __, 399 F.Supp.3d 1379, 1382 (2019) (citations omitted).

> *d) SFIPL's New Description Confirms Petitioners' Position that SFIPL's Reporting Is Not Supported by Substantial Evidence.*

SFIPL explained that it allocated the times for its machining process via three different

times: Process 1, Process 2, and Process 3. SFIPL Rebuttal Comment on Petitioner Second and

Third Post Preliminary Comment at 8-9 (July 13, 2020) (APPX12136). SFIPL reported a single

value for each of these processes and each of them is described as including the drilling process.

APPX12136-12137. The third process is the one that includes all machine processing steps on

CNC machines. In its new argument, SFIPL is asserting that it drilled and threaded some trader

fittings on CNC machines and then performed the rest of the processing steps on conventional

lathes. Thus, by definition, its reporting cannot be accurate. For the split-finished fittings, a

Process 3 time will not be accurate as it will include not only drilling time but the time for all of

the CNC machine processing steps. Any reporting of Process 1 or Process 2 times will similarly

not be accurate as it will include the drilling time that was actually performed on the CNC

machines. In sum, SFIPL's new information (if given credence) necessarily means that SFIPL

has over-allocated costs to its split-finished fittings.

### 3. Petitioners Correctly Identified Fittings for which SFIPL Reported CNC Finish Processing Costs.

SFIPL next argues that that Petitioners have incorrectly identified certain fittings as

having CNC machine finishing costs when, in fact, there were no in-house finishing costs

reported for the manufacture of the fitting, only processing performed by tollers for SFIPL

(identified as JBWK1 costs). *See* SFIPL Response Brief at 15-17. In so arguing, SFIPL ignores

22

critical elements of its own reporting.  SFIPL reported power costs for its in-house processing its

Section D Questionnaire Response, Exhibit D-12 (APPX825752), modified in its Second

Supplemental QR as Exhibit S2-16, and modified finally in its Sixth Supplemental QR as Exhibit

S5-7 (APPS89809).  SIFP also reported costs for processing by unaffiliated tollers in its Section

D QR, Exhibit D-13(a) (APPX82752), modified finally in its Sixth Supplemental QR as Exhibit

S5-8 (APPS89809).  For the analysis that Petitioners performed to identify any finish processing

on CNC machines for fittings sold to home market traders, Petitioners combined information

from Exhibits S5-7 and S5-8 so as to identify any such processing performed either in-house or

by a toller (JOB WORK).  *See* Report 1(b) (APPX13940-13968).

As SFIPL points out, for a specific CONNUM [                                    ], Petitioners'

report did not show any in-house reporting but did show JOB WORK processing.  What SFIPL

ignores in making its argument is that, like its in-house finish processing reporting, SFIPL's

toller processing is divided into three categories.  The category that SFIPL indicates costs are

shown for this CONNUM ('JBWK1 U1 Cost Allocated to Final Machining') is the category that

captures [

                                                                                        ].  This means that

SFIPL reported CNC finish processing costs for the [

                                                                        ].  Petitioners have correctly

included all of them in their report of CONNUMs sold to [

                                  ].

## IV.    CONCLUSION

Petitioners ask this Court to find that Commerce erred as a matter of law by not verifying

SFIPL's questionnaire responses and that Commerce's reliance on SFIPL's reporting of

NON-CONFIDENTIAL VERSION

processing costs was not supported by substantial evidence.  We ask that the Court remand with instructions that Commerce verify SFIPL's responses and re-consider its reliance on SFIPL's reporting of processing costs.

Respectfully submitted,

/s/ William Fennell

Roger B. Schagrin
Elizabeth J. Drake
William A. Fennell
SCHAGRIN ASSOCIATES
900 Seventh Street NW
Washington, D.C. 20001
(202) 223-1700
*Counsel for Bonney Forge*
*Corporation, and United Steel,*
*Paper and Forestry, Rubber,*
*Manufacturing, Energy, Allied*
*Industrial and Service Workers*
*International Union*

24

NON-CONFIDENTIAL VERSION

WORD COUNT CERTIFICATE OF COMPLIANCE


      In accordance with the Chambers Procedures of the United States Court of International Trade, the undersigned certifies that his brief complies with the word limitations set forth in the Chambers Procedures. Specifically, excluding those exempted portions of the brief, as set forth in 2 B (1) of the Chambers Procedures, I hereby certify that this brief contains 6704 words. In accordance with the Chambers Procedures, this certified word count is based on the word count feature in the word processing system (Microsoft Word) used to prepare this brief.


/s/ William Fennell
William Fennell
