## UNITED STATES COURT OF INTERNATIONAL TRADE

BONNEY FORGE CORPORATION, and
UNITED STEEL, PAPER AND FORESTRY,
RUBBER, MANUFACTURING, ENERGY,
ALLIED INDUSTRIAL AND SERVICE
WORKERS INTERNATIONAL UNION,

          Plaintiffs,

          v.

UNITED STATES,

          Defendant, and

SHAKTI FORGE INDUSTRIES PVT. LTD,

          Defendant-Intervenor.

      .

**Hon. Stephen A. Vaden**
**Ct. No. 20-03837**

**NON-CONFIDENTIAL VERSION**

## BRIEF ON REMAINING ISSUES

Roger B. Schagrin
Elizabeth J. Drake
William A. Fennell
SCHAGRIN ASSOCIATES
900 Seventh Street NW
Washington, D.C. 20001
(202) 223-1700

*Counsel for Bonney Forge Corporation*
*and the United Steel, Paper and Forestry,*
*Rubber, Manufacturing, Energy, Allied*
*Industrial and Service Workers*
*International Union*

Dated:  August 5, 2022

NON-CONFIDENTIAL VERSION

TABLE OF CONTENTS

I.     INTRODUCTION ............................................................................................. 1

II.    COMMERCE'S REDETERMINATION IS CONTRARY TO LAW AND NOT
       SUPPORTED BY SUBSTANTIAL EVIDENCE............................................... 2

       A.    Commerce's Refusal to Conduct Verification Is Contrary to Law and an Abuse of
             Discretion................................................................................................... 2

       B.    Even Based on the Conditions Prevailing during the Original Investigation, the
             Record Demonstrates that Commerce Could Have Conducted a Virtual
             Verification. ............................................................................................... 6

       C.    Commerce's New Definition of Verification is Contrary to Law and Not Supported
             by Substantial Evidence. ........................................................................... 7

             1.    Commerce's Characterization of Its Supplemental Questionnaires as
                   Sufficient to Constitute Verification Is Contrary to Law........................ 7

             2.    Substantial Evidence Does Not Support Commerce's New Determination. . 12

III.   COMMERCE'S CONCLUSION THAT SFIPL'S REPORTING OF PROCESSING
       COSTS WAS REASONABLE WAS NOT SUPPORTED BY SUBSTANTIAL
       EVIDENCE.................................................................................................... 14

IV.    THIS COURT SHOULD TAKE JUDICIAL NOTICE OF COMMERCE ACTIONS IN
       OTHER INVESTIGATIONS. ....................................................................... 16

V.     CONCLUSION.............................................................................................. 17

NON-CONFIDENTIAL VERSION

## TABLE OF AUTHORITIES

### Cases

*An Giang Fisheries Import And Export Joint Stock Co. v. United States*, 41 CIT __,  203 F.Supp.3d 1256 (2017) .......................................................................... 17

*Bomont Industries v. United States*, 14 C.I.T. 208, 733 F.Supp. 1507 (1990) ............................ 10

*Bonney Forge Corp. v. United States,* 46 CIT __, 560 F. Supp. 3d 1303 (CIT 2022) .............. 1, 3

*Borlem S.A.—Empreedimentos Industriais v. United States*, 913 F.2d 933 (Fed. Cir. 1990) ...... 17

*Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S 837 (1984)* .............. 9

*Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891 (2020) ............... 3

*Grobest & I-Mei Indus. (Vietnam) Co. v. United States*, 36 CIT 1092, 853 F.Supp.2d 1352 (2012) ............................................................................................................ 10

*Micron Technology, Inc. v. United States,* 117 F.3d 1386 (1997) ............................................... 10

*Rubberflex Sdn. Bhd. v. United States*, 23 CIT 461, 59 F.Supp.2nd 1338 (1999) ........................ 10

*Win–Tex Products, Inc. v. United States*, 17 CIT 786, 829 F.Supp. 1349 (1993) ....................... 17

### Statutes

19 U.S.C. § 1673 ............................................................................................................. 11

19 U.S.C. § 1677m(a) ...................................................................................................... 10

19 U.S.C. § 1677m(i) ....................................................................................................... 13

19 U.S.C. § 1677e(i)(1) .................................................................................................... 4

19 U.S.C. 1677e(a) ............................................................................................................ 7

19 U.S.C.§ 1677m(i) ........................................................................................................ 11

28 U.S.C. § 2641(a) .......................................................................................................... 16

### Regulations

19 C.F.R. § 351.307(c) ..................................................................................................... 12

### Administrative Determinations

*Certain Superabsorbent Polymers from the Republic of Korea: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Postponement of Final Determination, and Extension of Provisional Measures*, 87 Fed. Reg. 34647 (Dep't Commerce June 7, 2022)  5, 16

*Emulsion Styrene-Butadiene Rubber from the Russian Federation: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Postponement of Final Determination, and Extension of Provisional Measures*, 87 Fed. Reg. 38057 (Dep't Commerce June 27, 2022) ... 5, 16

*Oil Country Tubular Goods from the Russian Federation: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Preliminary Negative Critical Circumstances Determination, Postponement of Final Determination, and Extension of Provisional Measures*, 87 Fed. Reg. 28804 (Dep't Commerce May 11, 2022) ....................................... 5, 13

NON-CONFIDENTIAL VERSION

## I.     INTRODUCTION

In response to this Court's opinion in *Bonney Forge Corp. v. United States,* 46 CIT __, 560 F. Supp. 3d 1303 (CIT 2022) (ECF 57; APPX14262-14286) ("*Bonney Forge*"), the Department of Commerce ("Commerce") has filed a remand redetermination with the Court. "Final Results of Redetermination Pursuant to Court Remand" (ECF 61-1) ("*Redetermination*") (APPX14326-14362).  Per the Court's opinion and its scheduling order (Scheduling Order and Order Setting Oral Argument, entered on 7/15/2022, ECF # 66), Bonney Forge Corporation and the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC (collectively the "Petitioners") provide this brief on remaining issues.  The issues addressed herein arise from (1) Commerce's refusal to conduct an on-site or virtual verification on remand contrary to law and without adequate explanation or support; (2) Commerce's unsupported new conclusion in its *Redetermination* that it has verified the questionnaire responses of the respondent Shakti Forge Industries PVT. Ltd. ("SFIPL"); and (3) Commerce's original determination that the cost information supplied by the respondent was accurate and reasonably represented the costs it incurred to produce subject merchandise.  We address first the issues raised by Commerce's *Redetermination* and then the unaddressed issues raised by Commerce's original determination.

For the reasons below, we respectfully request that this Court again remand to Commerce with instructions to verify SFIPL's responses or explain why its decision to refuse to verify is in accordance with law and not an abuse of discretion, particularly in light of Commerce's recent decisions to conduct both virtual and on-site verifications in other pending proceedings.  In the event the Court accepts Commerce's new characterization of its post-preliminary questionnaires

as an adequate verification, we respectfully request that the Court remand to Commerce to address the cost reporting issues identified in our 56.2 brief and summarized below.

## II.   COMMERCE'S REDETERMINATION IS CONTRARY TO LAW AND NOT SUPPORTED BY SUBSTANTIAL EVIDENCE.

In its *Redetermination*, Commerce refuses to conduct a verification of SFIPL's responses, either through its usual on-site verification or virtually.  Commerce argues that circumstances external to the investigation prevented Commerce from verifying those responses, but it ignores the Court's instructions to base its remand determination on current conditions, not the conditions prevailing during the original investigation.  As shown below, under the conditions prevailing at the time of its remand determination and since that time, Commerce has in fact conducted both virtual and on-site verifications in pending proceedings.  Commerce offers no legitimate justification for not doing so here.

Instead, in an about-face, Commerce argues that it did verify the questionnaire responses of the respondent SFIPL in the original investigation.  This argument is contrary to law and not supported by substantial evidence.  For all these reasons, another remand is required to ensure that Commerce complies with its statutory and regulatory obligation to verify SFIPL's responses.

### A.   Commerce's Refusal to Conduct Verification Is Contrary to Law and an Abuse of Discretion.

In its slip opinion, the Court of International Trade quoted from a Supreme Court decision:

> First, the agency can offer a fuller explanation of the agency's reasoning *at the time of the agency action*. This route has important limitations. When an agency's initial explanation "indicate[s] the determinative reason for the final action taken," the agency may elaborate later on that reason (or reasons) but may not provide new ones. Alternatively, the agency can "deal with the problem afresh" by taking *new* agency action. An agency taking this route is not limited to its prior reasons but must comply with the procedural requirements for new agency action.

*Bonney Forge Corp.,* 560 F. Supp. 3d at 1311 (*quoting from Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1907–08 (2020)) (emphasis in original) (internal citations omitted) (ECF 57; APPX14275).  The Court summarized the Supreme Court's guidance by stating that Commerce has only two paths available: "{i}t can expand on the original explanations offered for the chosen action, or it may take new agency action consistent with procedural requirements."  *Id.*  Indeed, the Court made this clear in its opinion: "{a} new decision based on current conditions is most likely required."  *Id.* at 1313 (APPX14279). The Court also made it clear what kind of assessment would be appropriate: "{s}hould the Government maintain its position that verification remains impossible, the Government can explain in the record why it is safe for senior Department of Justice and Cabinet officials to travel to India in person on discretionary trips but not safe for civil servants with statutory responsibilities to perform to do the same, even if only virtually." *Id.* at 1306 (emphasis added) (APPX14264).  Finally, the Court instructed Commerce to seek an extension of time to file its remand results if necessary, presumably in the event that additional time was needed to permit the agency to conduct verification. *Id.* at 1316 (APPX 14286).

Here, Commerce has characterized its remand results as a "new agency determination." *Redetermination* at 2 (APPX14327).  Commerce's new determination, which, as explained in Section II.C below, is contrary to its original determination, cannot be considered an expansion "on the original explanations offered for the chosen action."  Therefore, Commerce must comply

3

with the procedural requirements of an investigation on remand, based on the conditions prevailing at the time of the remand determination.  The statute, of course, states that Commerce is required to verify the information it relies upon in an antidumping investigation: "{t}he administering authority shall verify all information relied upon in making … a final determination in an investigation." 19 U.S.C. § 1677m(i)(1).  In addition, Commerce's regulations state: (1) the agency "will" verify information relied upon in an investigation; (2) the agency "will" issue a verification report detailing its procedures, methods, and results; and (3) Commerce employees "will request access to all files, records, and personnel" relevant to factual information that has been submitted.  *See* 19 C.F.R. § 351.307(b)(1)(i), (c) and (d).  In order to comply with these requirements, Commerce must assess its ability to verify at the time of this remand, the time when it was making this new determination.  In its *Redetermination*, Commerce examines the circumstances that held at the time preceding this litigation, not the present circumstances.  *Redetermination* at 3-11 (APPX14328-14336).  But Commerce must consider the practices it has adopted for verification at the time of the remand, not at the time of its first determination in the original investigation.

Commerce's failure to consider current conditions during the time of its remand determination is particularly egregious given the fact that Commerce was in fact taking steps to conduct in-person verifications in May and June of 2022, prior to the filing of its remand results on June 30, 2022.  In several investigations, Commerce has stated its intent to conduct verification.  *See, e.g., Emulsion Styrene-Butadiene Rubber from the Russian Federation: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Postponement of Final Determination, and Extension of Provisional Measures*, 87 Fed. Reg. 38,057, 38,059 (Dep't Commerce June 27, 2022) ("*Emulsion Styrene-Butadiene Rubber from the Russian*

*Federation"*); and *Certain Superabsorbent Polymers from the Republic of Korea: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Postponement of Final Determination, and Extension of Provisional Measures*, 87 Fed. Reg. 34,647, 34,648 (Dep't Commerce June 7, 2022) ("*Certain Superabsorbent Polymers From the Republic of Korea*").

We respectfully request that this Court take judicial notice of the fact that Commerce has in fact scheduled on-site verifications in a number of cases as these remand results were being prepared and filed. *See* below our request that the Court take judicial notice of Commerce actions in other investigations and Attachment 1 to this brief.

Commerce refused to undertake any similar efforts to determine whether on-site verification was possible under current conditions on remand in this case. This failure renders its remand contrary to law and an abuse of discretion, especially in light of its efforts to conduct on-site verifications in other proceedings pending at the same time as this remand, including other proceedings involving Indian respondents. Finally, even if Commerce determined that on-site verification was not possible under current conditions in this case, it made no effort to assess whether a virtual verification was possible under current conditions at the time of the remand. Indeed, Commerce announced as early as May of this year its intention to conduct a virtual verification in an investigation. *See Oil Country Tubular Goods from the Russian Federation: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Preliminary Negative Critical Circumstances Determination, Postponement of Final Determination, and Extension of Provisional Measures*, 87 Fed. Reg. 28,804, 28,805 n.12 (Dep't Commerce May 11, 2022) ("*OCTG from Russia*"). As explained below, Commerce's determination on remand that a virtual verification was not possible at the time of the original investigation is deeply flawed.

NON-CONFIDENTIAL VERSION

Regardless, it has offered no analysis regarding its ability to conduct a virtual verification under the conditions prevailing at the time of its remand determination.

For all of these reasons, this Court should remand this proceeding with instructions to Commerce to verify SFIPL's information.  At a minimum, Commerce must explain why its refusal to verify under current conditions is in accordance with law and not an abuse of discretion, particularly in light of Commerce's recent decisions to conduct both virtual and on-site verifications in other pending proceedings.

**B.**     **Even Based on the Conditions Prevailing during the Original Investigation, the Record Demonstrates that Commerce Could Have Conducted a Virtual Verification.**

In its *Redetermination*, Commerce devotes many pages to explaining why neither it nor SFIPL could have engaged in any form of virtual verification.  *See Redetermination* at pages 14-21 and 29-34 (APPX14339-14346 and APPX14354-14359).  As we review above, the issue is not relevant to Commerce's new determination.  However, it stands as an inaccurate description of the investigation and should not be accepted by this Court. Despite its lack of home computers and the time difference between India and the U.S., SFIPL managed to make thirty-six electronic filings throughout the course of the investigation.  These filings included numerous questionnaire responses comprising thousands of pages; they demonstrate that, if necessary, SFIPL could have participated in a virtual verification session.[1]  In addition, the President of the company and two

---

[1] These include: Response for Section A Questionnaire Response: Forged Steel Fittings from India (A-533-891) (Feb. 5, 2020: 268 pages, APPX81681); Response for Section B and C Questionnaire Response: Forged Steel Fittings from India (A-533-891 (Feb. 24, 2020; 768 pages, APPX81949); Response for Section D Questionnaire Response: Forged Steel Fittings from India (A-533-891) (March 2, 2020; 1531 pages, APPX82717); Full Response for 2nd supplemental Questionnaire Response: Forged Steel Fittings from India (May 4, 2020: 1091 pages, APPX86498); Full Response for 5th supplemental Questionnaire Response: Forged Steel Fittings from India (July 6, 2020: 238 pages, APPX89539); Response for 6th supplemental Questionnaire Response: Forged Steel Fittings from India (July 23, 2020: 1760 pages, APPX89793).

NON-CONFIDENTIAL VERSION

consulting accountants were able to participate in the virtual hearing that Commerce held during the original investigation.[2]

As the record now stands, SFIPL has provided the information used by Commerce to determine dumping with little, if any, obligation to demonstrate its accuracy or completeness.

The record is clear: by declaring that it has verified SFIPL's questionnaire responses, rather than actually engaging in even a virtual verification, Commerce has acted contrary to law and has drawn a conclusion that is not supported by substantial evidence of record.

**C.      Commerce's New Definition of Verification is Contrary to Law and Not Supported by Substantial Evidence.**

      1.   <u>Commerce's Characterization of Its Supplemental Questionnaires as Sufficient to Constitute Verification Is Contrary to Law.</u>

In its *Redetermination*, Commerce completely reverses itself by making a "new agency determination that the post-preliminary questionnaires issued by Commerce satisfy Commerce's verification requirements." *Redetermination* at 2 (APPX14327). This is a complete reversal of its original determination that it had not verified the information. In its issues and decision memorandum for the investigation, Commerce said: "{a}ccordingly, as we were unable to conduct on-site verification in this investigation for reasons beyond our control, we relied on the record information used in the *Preliminary Determination* (and further developed via responses to subsequent questionnaires), as facts available in making our final determination." Decision Memorandum for the Final Determination in the Less-Than-Fair-Value Investigation of Forged Steel Fittings from India at 2-3 (Oct. 13, 2020) (APPX14127-14128). Under 19 U.S.C. § 1677e(a), if a party provides information but it cannot be verified, Commerce may rely on facts available for its determination. As Commerce did not find any of the other statutory conditions

---

[2] *See* Hearing Transcript of Sept. 11, 2020 at 3-4 (APPX14047-14048).

allowing for the use of facts available,[3] the legal basis for its use of facts available in the original determination must have been a finding by Commerce that SFIPL's information had not been verified. Thus, on the same record, Commerce has come to two completely opposite conclusions.

Commerce's new claim that is has verified SFIPL's responses is based on its two post-preliminary determination questionnaires: "we determine that the use of post-preliminary questionnaires in lieu of an in-person, on-site verification, and our subsequent analysis of the information collected via those questionnaires reasonably constituted verification of the factual information relied upon by Commerce in making its determination." *Redetermination* at 2 (APPX14327).

Commerce introduced the first of the two questionnaires by explaining that "{w}e have identified certain areas in Shakti Forge Industries Pvt. Ltd.'s (SFI) March 2, 2020 and May 4, 2020 (section D) submissions that require additional information." Post-Preliminary Questionnaire (June 15, 2020), transmittal letter at 1 (APPX89114). The questionnaire contained seven specific questions requesting further explanation of the information that SFIPL had already provided. *Id*., questionnaire at 3-5 (APPX89116-89118).

In its second questionnaire, Commerce again asked seven detailed questions about specific elements of information that SFIPL had provided, with one exception. Second Post-Preliminary Questionnaire (July 2, 2020) Attachment at 3-4 (APPX89537-89538). Commerce asked SFIPL to provide specific information to corroborate the information it reported for ten

---

[3] Commerce did not find any other basis, but, as reviewed in our original briefs filed with this Court and in our discussion below, Petitioners' position is that SFIPL did not in fact provide the information requested, specifically, cost information reasonably reflecting the costs of producing subject merchandise.

different invoices. *Id*. at 4 (APPX89538).   The answer to this question would provide a snapshot of the accuracy of SFIPL's reporting of sales prices and adjustments in the home market and in the U.S.  However, it left numerous other elements of SFIPL's reporting unexamined, including, most significantly, its costs.

Commerce did not:

- Review SFIPL's selection of products subject to the scope of the investigation or collect a list of products considered to be merchandise under consideration;
- Review SFIPL's quantity and value reconciliation;
- Test SFIPL's reported U.S. and home market databases for completeness;
- Review SFIPL's accounting and data systems including the systems used to report costs; nor
- Reconcile SFIPL's costs to its financial statements.

These are the kinds of inquiries that would allow Commerce to determine that SFIPL's reporting, as a whole, was accurate.  *See* sample cost questionnaires included as Attachment 1. They were not made.

In essence, Commerce is asserting that its transmittal of some questionnaires and conclusion that it has verified SFIPL's information somehow constitutes an acceptable form of verification – even though at the time it collected the information and analyzed it, Commerce had determined that it had not verified SFIPL's information.

The statute, of course, does not explicitly describe what constitutes a verification.  If the plain language of the statute is silent or ambiguous on the question at issue, "the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843 (1984) (footnote omitted).  The Federal Circuit has explained that "we review verification procedures employed by Commerce in an investigation for abuse of discretion rather than against

previously-set standards." *Micron Technology, Inc. v. United States,* 117 F.3d 1386, 1396 (Fed. Cir. 1997). In this proceeding, by re-characterizing its questionnaires designed to clarify certain specific information as verification questionnaires, Commerce has abused its discretion. This Court has explained that "verification is like an audit, the purpose of which is to test information provided by a party for accuracy and completeness." *Bomont Industries v. United States*, 14 C.I.T. 208, 209, 733 F.Supp. 1507, 1508 (1990).[4] Commerce's two post-prelim questionnaires omit many of the tests it normally performs as part of verification to determine the completeness of the information provided by a respondent. As this Court has said, when Commerce's "actions compromise the accuracy of dumping margins, then it has abused its discretion." *Rubberflex Sdn. Bhd. v. United States*, 23 CIT 461, 469, 59 F.Supp.2d 1338, 1346 (1999). By omitting many of the elements that it normally incorporates into a verification, Commerce has compromised the accuracy of its determination that SFIPL has reported accurate costs and not engaged in dumping.

In *Grobest & I-Mei Indus. (Vietnam) Co. v. United States*, 36 CIT 1092, 1105, 853 F.Supp.2d 1352, 1364-65 (2012), this Court rejected as an abuse of discretion actions by Commerce that are similar to those taken in this proceeding. Commerce had held on remand that it could not consider the information submitted by a single voluntary respondent under 19 U.S.C. § 1677m(a) because it would be too burdensome. The Court held that: "the burdens Commerce names in the *Remand Result* are the same burdens that occur in every review" and concluded that Commerce's interpretation of § 1677m(a) rendered it meaningless and so constituted an abuse of discretion. *Id.* at 1105.

---

[4] *See* Petitioners' discussion of verification in its 56.2 Brief at 9-14 (ECF 25) and in its rebuttal brief at 6-9 (ECF 42).

In the present investigation, Commerce's collection of sales, cost, and corporate information occurs in every investigation and review.  Commerce uses this information to determine that a class or kind of foreign merchandise is being, or is likely to be, sold in the United States at less than its fair value.  By conflating the statutory provisions requiring that (1) it obtain sufficient information to determine that a class or kind of foreign merchandise is being, or is likely to be, sold in the United States at less than its fair value (19 U.S.C. § 1673) and (2) that it verify information that it relies on for its final determination (19 U.S.C.§ 1677m(i)), Commerce has effectively done away with the latter.  It is not permissible for Commerce to effectively do away with its statutory requirement to verify by characterizing its actions as an investigating authority as, in all cases, also constituting verification.  Commerce's redetermination has rendered § 1677m(i) meaningless and so is contrary to law.

If this Court accepts Commerce's new-found verification as meeting its statutory requirement to conduct a verification and its regulatory requirement to provide a verification report, it will establish a precedent that hands Commerce a virtually unlimited ability to assert that it has verified any information it receives that it decides to rely upon.  As long as it sends out a series of questionnaires (which it always does unless a respondent stops participating in a proceeding), states without any elaboration that it has analyzed the data received in the questionnaires, and concludes that it is complete and accurate, Commerce will have, by definition, "verified" the information.  Such a result flies in the face of the statutory scheme. The very existence of a separate statutory provision requiring verification means that information collection and undescribed "analysis" alone are insufficient to constitute verification.  Yet that is precisely the result that Commerce asks the Court to accept here.

2.   <u>Substantial Evidence Does Not Support Commerce's New Determination.</u>

While Commerce may have asked some questions that are typical of those asked at verification in its post-preliminary questionnaires, Commerce did not undertake the assessment of Shakti's responses that is typical.  Commerce was not able to test values for reasonableness, assess values over time, trace values to accounting materials, tie accounting information to worksheets used to prepare reported (cost) information, examine Shakti's original books and records in real time, or identify missing information.  *See* sample cost questionnaires included as Attachment 1.

Commerce's own regulations specify that it will "report the methods, procedures, and results of a verification under this section prior to making a final determination in an investigation."  19 C.F.R. § 351.307(c).  Commerce provided no assessment of Shakti's information of a kind that typically appears in a verification report that summarizes the agency's findings.  Commerce explains the lack of an actual verification report by asserting that "petitioners had direct knowledge of the procedures and methods of verification, and the results of the verification . . . were placed directly on the record of this investigation."  *Redetermination* at 29 (APPX14354).  As it did not believe that it had verified SFIPL's information at the time of the original investigation, it did not at the time provide any report on the "methods, procedures, and results" of a verification.  In its redetermination, Commerce asserts that it analyzed the information it collected, but the agency provides no more detailed review of its methods and procedures than it did at the time of the original investigation.  Without any verification report or even a description of the analysis it alleges it has undertaken, Commerce's new determination is not supported by substantial evidence.

In fact, Commerce's characterization of verification in its *Redetermination* makes any assertion that it has verified even less tenable.  For example, it identifies as significant the fact

12

that Petitioners did not request a verification until they filed their case brief.  *Redetermination* at

9 (APPX14334).  Commerce ignores the fact that in a single memo dated August 4, 2020 it

cancelled verification and scheduled case briefs to be filed a week thereafter, on August 11,

2020.  Cancellation of Verification and Briefing Schedule at 1-2 (August 4, 2020) (APPX13906-

13907).  More importantly, the statute requires verification in investigations regardless of

whether or not it is requested by any of the parties.  19 U.S.C. § 1677m(i).  Commerce also

appears to consider it significant that Petitioners only requested a virtual verification in their

brief and did not discuss it at the hearing.  *Redetermination* at 9-10 (APPX14334-14335).  Again,

there is no statutory requirement that (a) a party request verification or (b) that a party requesting

verification has to emphasize its request by devoting extensive argumentation to it.  Commerce

also points out that Petitioners didn't explain what a virtual verification would entail or explain

how this might be done remotely.  *Id.* at 14 (APPX14339).  A paragraph later it explains that it

considered all options "including real-time virtual verification."  *Id.*  If Commerce needed

Petitioners to explain how the agency might undertake a virtual verification, how was it able to

consider such a verification as an option?[5]  Commerce also identifies as significant the fact that

the Petitioners did not submit deficiency comments regarding SFIPL's post-preliminary

questionnaires.  *Id.* at 18 (APPX14343).  The statute and regulations requiring verification do not

make it dependent on a party submitting deficiency comments.

Each of these mis-conceptions regarding the nature of verification provides additional

support for Petitioners' position that this Court should not accept Commerce's assertion that it

---

[5] *See OCTG from Russia,* 87 Fed. Reg. at 28,805 n.12 (Dep't Commerce May 11, 2022).   It does
not appear that petitioner in that case was obligated to identify the specific types of virtual
procedures that could be used in order for the virtual verification to occur.

has verified SFIPL's information.  In short, Commerce's new characterization of its post-preliminary questionnaires as verification is contrary to law, and abuse of discretion, and unsupported by substantial evidence.  This Court should therefore remand the determination to Commerce with instructions to actually verify SFIPL's responses in accordance with the statute and regulations and in light of current conditions, or explain why its refusal to verify is in accordance with law and not an abuse of discretion.

III.     **COMMERCE'S CONCLUSION THAT SFIPL'S REPORTING OF PROCESSING COSTS WAS REASONABLE WAS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE.**

In the event the Court accepts Commerce's new determination that it has in fact conducted verification, the Court should at a minimum remand the other challenged aspect of Commerce's determination – its unreasonable reliance on SFIPL's reporting of processing costs despite record evidence that fairly detracted from Commerce's conclusion.

In the first questionnaire response it filed in the investigation, SFIPL explained how it processed fittings.  *SFIPL Section A Questionnaire Response* (Feb. 5, 2020)) at Exhibit A-10(a) (APPX3635-3639) ("*SFIPL Sec. A QR*").  It distinguished between the processing performed on fittings sold to traders in India and that performed on the fittings sold to U.S. customers.  *Id.*  In a subsequent filing, SFIPL asserted that the distinctions it had drawn were in fact between finished and unfinished fittings and not between markets.  *SFIPL Response for 4th Supplemental Questionnaire* (April 27, 2020) at 1-2 (APPX8822) ("*SFIPL 4th Sup. QR*").  In a subsequent filing, SFIPL reiterated the distinctions in processing performed based on the markets it was selling to. *SFIPL Rebuttal Comment on Petitioner Second and Third Post-Preliminary Comment* (July 13, 2020) at 8-9 (APPX12136-12137).

NON-CONFIDENTIAL VERSION

Analysis of the specific language in SFIPL's first explanation makes it clear that the steps in one stage of processing could only apply to finished fittings, so that SFIPL's later attempt to recast its processing distinctions as between finished and unfinished fittings was not relevant to the processing performed in that stage.  Petitioners' analysis of SFIPL's cost reporting demonstrated that it had allocated certain processing costs to [

] Commerce's reversible error lies in its illogical acceptance of SFIPL's assertion that the only processing distinctions it had made were between finished and unfinished fittings.  Commerce accepted SFIPL's assertion that the processing distinction it meant to make between finished and unfinished fittings somehow explained the distinctions it had made [                           ], even though that processing step was performed only on finished fittings.  Because of this, Commerce rejected Petitioner's analysis and accepted SFIPL's cost reporting.  This led Commerce to unreasonably reject as irrelevant Petitioner's demonstration of SFIPL's misallocation of costs between markets.

Plaintiffs have reviewed this issue in detail in their 56.2 brief.  *Plaintiffs' Brief* (April 26, 2021) at pages 4-6 (factual information) and 14-25 (ECF 25).  Plaintiffs also replied to claims raised by the defendant and defendant-intervenor regarding this issue in its *Confidential Reply Brief* (July 24, 2021) at 1-23 (ECF 41).  In the event this Court accepts Commerce's new characterization of its post-preliminary questionnaires as a sufficient verification of SFIPL's responses, we respectfully request that the Court at a minimum remand the issue of SFIPL's cost reporting so that Commerce may reconsider the issue and ensure its determination is supported by substantial evidence, including evidence demonstrating the flaws in that reporting.

**IV.     THIS COURT SHOULD TAKE JUDICIAL NOTICE OF COMMERCE ACTIONS
IN OTHER INVESTIGATIONS.**

Petitioners have cited above to other investigations currently in progress where

Commerce has stated its intent to verify.  *See Certain Superabsorbent Polymers from the*

*Republic of Korea*, 87 Fed. Reg. at 34,648; and *Emulsion Styrene-Butadiene Rubber from the*

*Russian Federation*, 87 Fed. Reg. at 38,059. In these investigations, Commerce has, in fact,

undertaken on-site in-country verifications of foreign respondents.  Petitioners have included in

Attachment 1 copies of the public versions of cost verification outlines transmitted to

respondents in them.  These show that Commerce had scheduled on-site verifications of

respondents in foreign countries as well as the extent of the questions that Commerce asked the

respondents to be prepared to answer.

The statute provides that the Federal Rules of Evidence apply to civil actions before this

Court.  28 U.S.C. § 2641(a).  Under those rules, the Court may judicially notice an adjudicative

fact that is not subject to reasonable dispute because it can be accurately and readily determined

from sources whose accuracy cannot reasonably be questioned.  Fed. R. Evid. § 201(b)(2).  It is

clear on their faces that these documents are genuine: they are on Commerce Department

letterhead, and they include bar code and time stamp information from the Commerce

Department's on-line filing system, ACCESS.[6]  By taking notice of them, the Court will be

apprised of facts relevant to Commerce's actions regarding verification in the present litigation.

When asked to consider the issue of judicial notice in an appeal based on an

administrative record of a proceeding before the International Trade Commission, the Federal

Circuit has also held that the Court may take judicial notice of a revised Commerce final

---

[6] The defendant (the author of the documents), of course, is free to challenge their authenticity.

determination. *Borlem S.A.—Empreedimentos Industriais v. United States*, 913 F.2d 933, 940 (Fed. Cir. 1990).

Relying of Rule 201 in another case, this Court took judicial notice of the facts in a Commerce document (a final determination) in another segment of the proceeding before it. *An Giang Fisheries Import And Export Joint Stock Co. v. United States*, 41 CIT __, __, 203 F.Supp.3d 1256, 1284 (2017).

This Court has also taken judicial notice of unpublished Commerce Department documents. In an appeal of a scope ruling, a party asked the Court to take judicial notice of an earlier unpublished scope ruling. The Court took notice of the document and said that "indisputable facts like the agency's own prior determinations may be judicially noticed by the court when such notice is requested by a party and is otherwise appropriate." *Win–Tex Products, Inc. v. United States*, 17 CIT 786, 789, 829 F. Supp. 1349, 1352 (1993).

## V.     CONCLUSION

Petitioners respectfully submit that Commerce has not complied with this Court's remand determination by refusing to conduct any type of verification on remand and instead deeming its prior questionnaires sufficient to meet the statutory and regulatory requirements for verification. The failure to verify, if allowed to stand, will permit SFIPL to maintain a zero dumping margin – and escape any discipline under the antidumping order – despite the serious concerns with its cost reporting identified above. Such a result denies Bonney Forge and its workers the relief they are entitled to under the law. Commerce's approach also stands in stark contrast to the commendable efforts the agency has undertaken to verify other respondents' information, both on-site and virtually, in other proceedings pending concurrently with this remand determination.

NON-CONFIDENTIAL VERSION

For these reasons, Petitioners respectfully request that this Court remand to Commerce with instructions to verify SFIPL's responses.  At a minimum, the Court should remand to Commerce with instructions to address the cost reporting issues identified above and support its determination with substantial evidence.

Please contact the undersigned with any questions regarding this submission.

Respectfully submitted,

/s/ William Fennell

Roger B. Schagrin
Elizabeth J. Drake
William A. Fennell
SCHAGRIN ASSOCIATES
900 Seventh Street NW
Washington, D.C. 20001
(202) 223-1700
*Counsel for Bonney Forge*
*Corporation, And United Steel,*
*Paper and Forestry, Rubber,*
*Manufacturing, Energy, Allied*
*Industrial and Service Workers*
*International Union*

# ATTACHMENT 1

Barcode:4262166-01 A-580-914 INV - Investigation

UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

A-580-914
Investigation
POI: 10/01/2020 – 09/30/2021
Public Version
OA: YZ

July 11, 2022

LG Chem, Ltd.
c/o J. David Park
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Ave., NW
Washington, DC 20001

Re:     Less-Than-Fair-Value Investigation of Certain Superabsorbent Polymers from the
        Republic of Korea

Dear Mr. Park:

Enclosed you will find the agenda we intend to follow at the verification of your client's cost
questionnaire response.  Section 782(i) of the Tariff Act of 1930, as amended (the Act), requires
us to verify the information used in making a final determination.  As discussed with you
previously, Yan Zhang and Michael Martin will conduct the verification of LG Chem, Ltd.
(LGC) from July 18, 2022, through July 22, 2022 in Seoul, Korea.

The agenda is the plan that the verifiers intend to follow and, as such, is written as instructions to
the verifiers.  This agenda allows your client to prepare in advance the documentation required to
verify each item and to properly brief the appropriate personnel on the items to be covered.  The
agenda identifies the general areas the verifiers will examine and the verification procedures that
they will perform.  You must demonstrate how the data submitted in the response reconciles to
the Company's general ledger, cost accounting system, and financial statements.  The enclosed
agenda is not necessarily all inclusive and we reserve the right to request any additional
information or materials we deem necessary for a complete verification.

The Company must be prepared for all items on the agenda in case the verification proceeds
more rapidly than anticipated.  At the beginning of the verification, your client must have
complete supporting documentation for the selected products and each verification procedure.
Complete supporting documentation would consist of a complete trail of calculations, supporting
schedules, selected invoices and sub-ledgers tracing the reported per-unit costs back to the
general ledger accounts and source documents.  The verifiers will request detailed



INTERNATIONAL
T R A D E
ADMINISTRATION

LG Chem, Ltd.                                                                                                    A-580-914
Cost Verification Agenda                                                                                      Page 2

documentation on all important accounts.  The verifiers will require copies of certain documents
as verification exhibits.  <u>You should make copies of the complete supporting documentation
before the verification</u>.  As you will note, the time available for the verification is limited.
Consequently, the appropriate personnel must gather the information requested prior to the
verifiers' arrival.

In addition to examining supporting documentation, the verifiers will need to speak to
appropriate personnel concerning your client's questionnaire responses and other information
submitted on the record of the proceeding.  Please ensure appropriate personnel are made
available to the verifiers.  Please note that the names and titles of all company personnel and
representatives participating in the verification, regardless of the role played, will be included in
the verification report and treated as public information.

It is the responsibility of your client to be fully prepared for this verification.  If your client is not
prepared to support or explain a response item at the appropriate time, the verifiers may move
onto another topic.  If, due to time constraints, returning to that item is not possible, we may
consider the item unverified.  Furthermore, if information requested for verification is not
supplied, or is unverified, pursuant to section 776(a) of the Act, we may use facts available for
our final determination, which may include information supplied by the petitioners.

Please note that the purpose of verification is to verify the database and questionnaire responses
which were submitted prior to verification.  Verification is not an opportunity to submit new
factual information.  19 CFR 351.301(b) establishes time limits for the submission of new factual
information and 19 CFR 351.302 establishes procedures for the extension of time limits, the
return of untimely filed or unsolicited material.  If minor errors were found in any of your
previously submitted filings they must be presented at the start of verification.  If you present
corrections of minor errors, you must file the information at the Department of Commerce
(Commerce) and serve it by hand on the petitioner <u>within two business days of the start of
verification</u>.

Section 777(c)(1) of the Act provides for the release of all business proprietary information,
under administrative protective order (APO), presented to or obtained by Commerce during a
proceeding, except privileged information, classified information, and specific information of a
type for which there is a clear and compelling need to withhold from disclosure.  As such, we
request that you file and serve verification exhibits no later than the end of the fifth business day
after each verification is completed.  Unless you provide detailed, specific information to
establish that there is a "clear and compelling need" to withhold a verification exhibit from
disclosure, all business proprietary exhibits must be filed with Commerce as business proprietary
documents and served on all parties on the APO service list in accordance with
19 CFR 351.303(b) and 351.303(f) no later than the end of the fifth business day after each
verification is completed.  It is not necessary to create, file, or serve public versions of exhibits
that are not public in their entirety.  Your submission of the exhibits must be accompanied by the
certificate of service required by 19 CFR 351.303(f)(2) indicating service on the parties on the

Barcode:4262166-01 A-580-914 INV - Investigation  -

LG Chem, Ltd.                                                                          A-580-914
Cost Verification Agenda                                                                  Page 3

APO service list, as well as the certificates of factual accuracy included with the initial questionnaire issued to you by Commerce.  Exhibits that are public in their entirety (*e.g.*, public laws, annual reports) must be filed with Commerce and served in accordance with the requirements set forth in 19 CFR 351.303(b) and 351.303(f) for submission of public information.  If, upon review, Commerce finds that any of the exhibits filed do not match the exhibits that Commerce decided to take during verification, Commerce will notify the submitter and other parties, and will take appropriate steps to address any inconsistencies.

All exhibits must be filed electronically using Enforcement and Compliance's Antidumping and Countervailing Duty Centralized Electronic Service System (ACCESS).  An electronically filed document must be received successfully in its entirety by Commerce's electronic records system, ACCESS, by 5 p.m. ET, unless otherwise specified by Commerce, on the fifth business day after verification is completed.  Documents excepted from the electronic filing requirement under 19 CFR 351.303(b)(2)(ii) must be filed manually (*i.e.*, in paper form) with the APO/Dockets Unit in Room 18022 and stamped with the date of receipt on the fifth business day after verification is completed.

If you have any questions regarding this verification or feel you cannot perform certain verification procedures, contact Yan Zhang at (202) 482-3199 or Taija Slaughter at (202) 482-3563, respectively.

Sincerely,

*Taija A. Slaughter*

Taija A. Slaughter
Supervisory Accountant
Office of Accounting
Enforcement and Compliance

LG Chem, Ltd.                                                                      A-580-914
Cost Verification Agenda                                                              Page 4

## I.    <u>GENERAL</u>

The verification will focus on the cost data file submitted on April 04, 2022 and the worksheets, reconciliations, and other links to your company's books and records.  Therefore, all original worksheets, reconciliations and links must be available at verification.

A.  If minor errors were found in any of your previously submitted filings they must be presented at the start of verification.[1]  For each minor correction provide a description of the error, the amount, the number or group of CONNUMs affected, and quantify the amount of the error's impact on the previously reported CONNUM costs.

B.  Costs for the following products will be reviewed in detail at the verification.  Therefore, complete supporting documentation must be prepared in advance for each.[2]
   1.  CONNUM [ ];
   2.  CONNUM [ ]; and
   3.  The largest non-subject product [                                        ].

## II.  <u>REVIEW OF COMPANY'S FINANCIAL ACCOUNTING AND COST ACCOUNTING SYSTEMS</u>

The purpose of this section is to give the verifier a more complete understanding of the accounting systems and reporting methods.  The discussions should focus on what was reported in the respondent's cost submissions.

A.  Discuss the corporate structure of LGC including all consolidated and non-consolidated affiliated parties.  Identify all companies involved in the various aspects of the production and sale of the merchandise under consideration (MUC).

B.  Review accounting procedures and policies.
   1.  Discuss LGC's financial accounting system:
       a.  review and discuss with management the financial statements normally prepared by the company;

---

[1]  Minor errors are minor mistakes in addition, subtraction, or other arithmetic function, minor data entry mistakes, clerical errors resulting from inaccurate copying, duplication, or the like, and minor classification errors. Minor errors do not include items such as methodology changes.

[2]  Complete supporting documentation consists of a complete trail of calculations for the amounts reported in each cost of manufacturing field on the COP/CV data file.  As necessary provide, calculations of quantities and values, supporting schedules, copies of selected invoices or copies of pages from sub-ledgers to trace the reported per-unit amount reported for each field back to the accounting data kept in the normal course of business.  The documentation must clearly demonstrate the allocation of common costs between specific products, both subject and non-subject.

  b.   review the account coding scheme, chart of accounts, general ledger and subsidiary ledgers with company officials;

  c.   discuss all policies effecting raw materials inventory, work-in-process and cost of sales (*i.e.*, valuation methodology, lower of cost or market policy, accounting entries, year-end adjustments).

 2.   Discuss LGC's cost accounting system:

  a.   discuss the extent to which the company normally tracks product specific costs;

  b.   obtain sample copies of all cost accounting reports normally generated. Review a copy of each report and discuss with company officials when, where and how information is collected on costs, production quantity, labor hours, etc.;

  c.   review and discuss sections of LGC's submissions that describe the methodologies used to account for and to allocate materials, labor and overhead costs to each product; and,

  d.   obtain a list of all direct and indirect cost centers (see Section D questionnaire II.C.5 and 6).

C.   Discuss the production process described in the section D response:

 1.   obtain flowcharts or diagrams of the production process and the factory layout;

 2.   discuss the general operations and processes performed; and,

 3.   obtain a sample copy of each production report generated from the production control system. Review the reports and discuss with company officials what production data is used by the cost accounting system and the inventory system. Discuss when, where and how information contained in the reports is collected on production quantities, labor hours, machine hours, etc.

## III. <u>COST RECONCILIATIONS</u>

The main objective of this section is to determine whether the company's overall costs have been appropriately included or excluded from the reported costs. This section takes a "top down" approach (*e.g.*, financial statements to per-unit cost), starting with cost of sales from the financial statements and proceeding step-by-step down through the cost of manufacturing for the reporting period to the summation of the reported per-unit costs. Section IV below takes a "bottom up" approach in verifying the per-unit costs and how they reconcile with the Company's normal cost and financial accounting systems. The steps identified in this section <u>must</u> be accomplished before proceeding to any other areas of the agenda and before any additional testing can be performed.

A.   Review the reconciliation of the **fiscal year income statement** (*i.e.*, revenues, cost of sales, selling and administrative expenses, and non-operating expenses) in the audited financial statements <u>to</u> the total costs in **the financial accounting system** (*e.g.*, general ledger or trial balance). Discuss each reconciling item and obtain supporting documentation for all major or unusual reconciling items.

LG Chem, Ltd.                                                                    A-580-914
Cost Verification Agenda                                                          Page 6

B.  Review the reconciliation of **the total fiscal year cost of sales** from the financial accounting system **to the total POI costs of sales**. Discuss each reconciling item and obtain supporting documentation for major reconciling items.

C.  Review the reconciliation of the **total POI cost of sales to** the total POI costs from **the cost accounting system** (*i.e.*, the source used to derive the reported costs).  Discuss each reconciling item and obtain supporting documentation for major reconciling items.

D.  Review the reconciliation of the **total POI costs from the cost accounting system** (*i.e.*, the source used to derive the reported costs) **to** the **total POI cost of manufacturing (COM)**. Commerce defines COM as the cost of materials, labor, variable overhead and fixed overhead costs incurred to produce the finished goods during the **POI**.  Thus, the COM should exclude general and administrative expenses and financial costs.  Discuss each reconciling item and obtain supporting documentation for major reconciling items.

E.  Review the reconciliation of **the total POI COM to the total of the per-unit manufacturing costs submitted to Commerce** (*i.e.*, multiply the reported COMs of all MUC for the POI/POR by their respective production quantities, then sum the totals). Discuss each reconciling item and obtain supporting documentation for major reconciling items, including the following items:
    1.  differences between the reporting methodology and the normal record keeping;
    2.  cost of merchandise not under consideration (non-MUC);
    3.  if not already provided, the total cost of the MUC not sold in the United States or comparison market;
    4.  cost of the MUC sold in the U.S. or comparison market that the company has been excused from; and,
    5.  all other reconciling items.

## IV. **REPORTED PER-UNIT COSTS**

The main objective of this section is to determine whether: 1) expenses have been correctly allocated between individual products; 2) expenses have been correctly allocated between the MUC and the non-MUC; 3) the allocation bases used for particular expenses are reasonable; and, 4) expenses are classified correctly.

A.  For each of the CONNUMs selected above at **I.B**, obtain and perform the following.
    1.  LGC produced the MUC at [                                        ] during the cost reporting period, for each CONNUM obtain a worksheet that demonstrates the method used to weight-average the production costs of each facility in order to compute the single weighted-average COM (and the individual fields included therein).  Test the weight averaging across facilities and trace the costs to the cost file (*e.g.*, the individual fields included therein).

2. For the facility with the highest production quantity for each of these CONNUMs, if that facility's CONNUM-specific cost is itself a weighted-average cost of several unique products, obtain worksheets showing the calculation of that facility's weighted-average figures for the CONNUM. The worksheets must show all products produced at the facility which were weight-averaged together to obtain that facility's costs for the specified CONNUMs. For each unique product shown on the worksheet, it must show the product's internal product code, production quantity, and corresponding value for each computer field. Test the weight averaging for the facility and trace the costs to the worksheets from **IV.A.1**.

   a. Test that the classification of the internal product codes which were included in the CONNUM cost buildup was appropriate by comparing the product codes to the product list key submitted in the section A response.

   b. Test that the internal product codes of the products which were excluded from the MUC are appropriate by comparing the excluded product codes to the product list key submitted in the section A response.

3. For the unique product with the highest production quantity in each set of worksheets reported for question **IV.A.2**, obtain product cost buildup worksheets that demonstrate how each data field within TOTCOM was determined.

B. Production Quantities
   1. Trace the reported production quantities for the finished products that are in each selected CONNUM identified in I.B above to production or inventory records for the factory.

   2. Tie the quantities from the company records to the worksheets showing all products produced at the facility that were weight-averaged together to obtain that facility's costs for the specified CONNUM (i.e., IV.A.2).

C. Materials
   1. Obtain schedules that show the monthly inventory movement of [          ], [          ], and [          ] for the POI (*i.e.*, quantity and value of beginning inventory, purchases, consumed in the production process, other adjustments, and ending inventory).

      a. Trace beginning and ending inventory to the financial accounting system (trial balance or financial statements).

      b. Trace the quantities consumed in the production of finished products to inventory and/or production records. Tie the value consumed in production to the calculation of the per-unit material cost included in the reported costs. Identify how taxes, duties, transportation costs, etc. have been accounted for in the reported costs.

      c. Trace purchases to purchase journals or inventory records. Trace selected transactions to invoices. Identify how taxes, duties, transportation costs, etc. have been accounted for in the reported costs.

LG Chem, Ltd.                                                                                          A-580-914
Cost Verification Agenda                                                                              Page 8

2. Review the product cost buildup worksheets (**IV.A.3.**) that show the per-unit material
   cost calculation for the products listed in **I.B**.  The worksheets must show the calculations
   for total direct material cost in COM, as well as, the individual material cost fields.  The
   worksheets should include the calculation of the yield loss at each subsequent production
   stage, and any by-product or scrap revenue offset.
   a. Trace the values and quantities for the elements in the calculation of material costs to
      source records from the financial and cost accounting systems.
   b. For each selected product, recalculate the per-unit material costs shown on the
      product cost buildup worksheets and trace to the material costs reported in the direct
      material computer fields (DIRMAT).

3. Review and document that material costs are assigned specifically to the individual
   products that contain the given material (*i.e.*, material costs are not averaged across all
   products).

D. Yield Loss and Offsets
   1. If not already shown on the product cost buildup worksheets, obtain a worksheet
      demonstrating how the Company has accounted for the yield loss associated with each
      production stage.  For selected stages of production, using actual input and output data
      from production records, compare the actual yields for certain production runs to the
      yield included in the reported costs.

   2. Obtain a schedule that shows the quantity of the by-product [        ] generated during the
      cost reporting period, the quantity of the [        ] sold, and the revenue received from the
      sale, and the quantity of the [        ] that was recycled as an input in the production
      process of the MUC.  Review the schedule to ensure that the [        ] sold are related to
      the production of the MUC.  Trace amounts to company records and source documents.
      Recalculate the offset.  For the [        ] that is reintroduced into the production process,
      document that the price assigned to the item when it is reintroduced back into production.

E. Conversion Costs – Labor, Energy and Overhead Costs
   1. Review the product cost buildup worksheets (**IV.A.3**) that show the per-unit conversion
      costs' calculation for the products listed in **I.B**.  The worksheets must show the
      calculations for total conversion costs in COM, as well as, any separately identified
      production stage.
      a. For elements in the calculation of conversion costs, trace the values and quantities to
         source documents (*i.e.*, financial and cost accounting systems).
      b. For each selected product, recalculate the per-unit conversion costs shown on the
         product cost buildup worksheets and trace the amount to the conversion costs
         reported in the computer fields (*e.g.*, DIRLAB, VOH, FOH).

Barcode:4262166-01 A-580-914 INV - Investigation  -

LG Chem, Ltd.                                                                                          A-580-914
Cost Verification Agenda                                                                           Page 9

2. Select specific conversion costs (*e.g.*, labor, energy, depreciation, etc.) or perhaps a whole cost center and test the price (or value) and quantity used in the reported product cost buildups worksheets.

   a. Obtain copies of records that show the actual consumption quantity of the selected expense at a production stage. For example, data from electricity usage meters at specific cost centers or total hours worked on a shift as shown on a production report, payroll records, etc. Compare the per-unit consumption quantities recorded in the company's production records to the per-unit consumption quantity used in the product cost buildup worksheets for that stage. If per-unit consumption quantities are not maintained, then use the most specific data available (*e.g.*, the total consumption for a cost center or product group).

   b. Compare the value for the expense on the cost buildup worksheets to invoices or other accounting documents that support the amount of the rate. For example, compare payroll information for the shift to the wage rates used or depreciation expense per depreciation ledgers to the depreciation for a cost center for which you are recalculating overhead costs.

3. Review and test that the conversion costs are not the average of some or all products but are specific to the conversion activities associated with individual products.

   a. If the same process is applied to specific products within a production location, but in various ways or at different lengths of time, document that the products are allocated proportional amounts of processing cost.

   b. If different processes are applied to specific products within a production location document that a product is allocated only the relevant costs associated with the process it receives.

4. From the product cost buildup worksheets, select a production stage for testing the appropriateness of the allocation factors used. Discuss with Company officials whether the allocation factor (*e.g.*, tons, machine hours, labor hours, etc.) reasonably represents how the costs being allocated relate to the product produced.

F. Affiliated Party Purchases

1. Review the price comparison of [                ] and [                    ] purchased from affiliated and unaffiliated suppliers.

2. Test the comparison by tracing amounts listed for the purchase of materials or services from both affiliated and unaffiliated suppliers to the purchase journal or other company records.

LG Chem, Ltd.                                                                                A-580-914
Cost Verification Agenda                                                                       Page 10

## V.  SELLING, GENERAL AND ADMINISTRATIVE EXPENSES

A.  Obtain a worksheet showing LGC's calculation of the G&A expense factor.  Recalculate the per-unit G&A expense amount and trace the amount to the G&A expense reported in the computer fields.

B.  Identify on the fiscal year trial balance, or other company records, the total packing costs, selling expenses, movement costs and G&A expenses that are included in the cost of goods sold amount on the financial statements.  Ensure that they are removed from the denominator of the G&A rate.

C.  Obtain a schedule that identifies all major categories of selling, general and administrative expenses. Review the classification of expenses between selling and G&A.  Ensure the expenses classified as selling expense, packing costs, and movement costs agree with the items reported in section B and C or the sales verification exhibits.

D.  Obtain a schedule showing all non-operating and extraordinary income and expense items (*e.g.*, exchange gains and losses, other income and expense, dividend income, etc.). Reconcile the schedule to the financial statements and identify how each of these items is accounted for in the submitted costs.  For each item, obtain a detail of the account and a brief description of each transaction in the detail listing.  For significant items, obtain copies of supporting documentation.

E.  Trace the total of selling, general and administrative expenses, and cost of sales to LGC's FY 2021 audited unconsolidated financial statements.

## VI. FINANCIAL EXPENSES

A.  Obtain a worksheet showing the calculation of the financial expense rate.  Recalculate the per-unit amount and trace the amount to the interest expense reported in the computer fields.

B.  Obtain a schedule of interest income earned from short-term sources.  Review documentation supporting the claim that interest income is from short-term sources.  Trace the interest income earned from short-term sources to the amount used to offset interest expense.

C.  Determine that the net exchange gains and losses have been included in the financial expense rate calculation.

D.  Trace the cost of sales, interest expense, net exchange gains and losses and interest income used to calculate the financial expense to LGC's FY 2021 audited consolidated financial statements.

LG Chem, Ltd.                                                                              A-580-914
Cost Verification Agenda                                                                     Page 11

# **Attachment 1**

To facilitate the proceedings, please have the following available for the verification:

1. for each verification procedure that indicates the verifiers must obtain a list, a schedule, a description, etc., the item must be prepared in advance and available on the first day of verification;
2. a complete set of all your submissions;
3. copies of the worksheets used to link the submitted amounts to the Company records;
4. original Company records and other source documentation used to prepare any part of the response (*e.g.*, a general ledger, trial balance, purchase journals, production reports, inventory ledgers, fixed asset ledgers, etc.);
5. appropriate personnel with access to the online accounting and production systems;
6. appropriate personnel who are knowledgeable about the data in the response and the underlying accounting systems; and,
7. access to a copy machine.

Barcode:4268714-01 A-821-835 INV Investigation -

UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

A-821-835
Investigation
POI:  10/01/20 – 09/30/21
~~Business Proprietary Document~~
E&C/OA:  SS
**PUBLIC VERSION**

July 28, 2022

PJSC TATNEFT
c/o: Jay C. Campbell
White & Case LLP
701 Thirteenth Street, N.W.
Washington, DC  20005

Re:  Antidumping Duty Investigation of Emulsion Styrene-Butadiene Rubber from the Russian
     Federation

Dear Mr. Campbell:

Enclosed you will find the agenda we intend to follow at the verification of your client's cost
questionnaire response.  Section 782(i) of the Tariff Act of 1930, as amended (the Act), requires
us to verify the information used in making a final determination.  As discussed with you
previously, Samuel Shobowale and Alma (Angie) Sepúlveda will conduct the verification of
PJSC TATNEFT (TATNEFT) and LLC Tolyattikauchuk (Tolyattikauchuk) from August 8
through August 12, 2022, in Zug, Switzerland.

This agenda allows your client to prepare in advance the documentation required to verify each
item and to properly brief the appropriate personnel on the items to be covered.  The agenda
identifies the general areas the verifiers will examine and the verification procedures that they
will perform.  You <u>must</u> demonstrate how the data submitted in the response reconciles to the
Companies general ledgers, cost accounting systems, and financial statements.  The enclosed
agenda is not necessarily all inclusive and we reserve the right to request any additional
information or materials we deem necessary for a complete verification.

The companies must be prepared for all items on the agenda in case the verification proceeds
more rapidly than anticipated.  At the beginning of the verification, your client must have
complete supporting documentation for the selected products and each verification procedure.
Complete supporting documentation would consist of a complete trail of calculations, supporting
schedules, selected invoices and sub-ledgers tracing the reported per-unit costs back to the
general ledger accounts and source documents.  The verifiers will request detailed



documentation on all important accounts.  The verifiers will require copies of certain documents as verification exhibits.  <u>You should make copies of the complete supporting documentation before the verification</u>.  As you will note, the time available for the verification is limited. Consequently, the appropriate personnel must gather the information requested prior to the verifiers' arrival.

In addition to examining supporting documentation, the verifiers will need to speak to appropriate personnel concerning your client's questionnaire responses and other information submitted on the record of the proceeding.  Please ensure appropriate personnel are made available to the verifiers.  Please note that the names and titles of all company personnel and representatives participating in the verification, regardless of the role played, will be included in the verification report and treated as public information.

It is the responsibility of your client to be fully prepared for this verification.  If your client is not prepared to support or explain a response item at the appropriate time, the verifiers may move onto another topic.  If, due to time constraints, returning to that item is not possible, we may consider the item unverified.  Furthermore, if information requested for verification is not supplied, or is unverified, pursuant to section 776(a) of the Act, we may use facts available for our final determination, which may include information supplied by the petitioners.

Please note that the purpose of verification is to verify the database and questionnaire responses which were submitted prior to verification.  Verification is not an opportunity to submit new factual information.  19 CFR 351.301(b) establishes time limits for the submission of new factual information and 19 CFR 351.302 establishes procedures for the extension of time limits, the return of untimely filed or unsolicited material.  If minor errors were found in any of your previously submitted filings, they must be presented at the start of verification.  If you present corrections of minor errors, you must file the information at the Department of Commerce (Commerce) and serve it on the petitioner <u>within two business days of the start of verification</u>.

Section 777(c)(1) of the Act provides for the release of all business proprietary information, under administrative protective order (APO), presented to or obtained by Commerce during a proceeding, except privileged information, classified information, and specific information of a type for which there is a clear and compelling need to withhold from disclosure.  As such, we request that you file and serve verification exhibits no later than the end of the fifth business day after each verification is completed.  Unless you provide detailed, specific information to establish that there is a "clear and compelling need" to withhold a verification exhibit from disclosure, all business proprietary exhibits must be filed with Commerce as business proprietary documents and served on all parties on the APO service list in accordance with 19 CFR 351.303(b) and 351.303(f) no later than the end of the fifth business day after each verification is completed.  It is not necessary to create, file, or serve public versions of exhibits that are not public in their entirety.  Your submission of the exhibits must be accompanied by the certificate of service required by 19 CFR 351.303(f)(2) indicating service on the parties on the

Barcode:4268714-01 A-821-835 INV - Investigation -

TATNEFT and Tolyattikauchuk                                          A-821-835
Cost Verification Agenda                                                Page 3

APO service list, as well as the certificates of factual accuracy included with the initial
questionnaire issued to you by Commerce. Exhibits that are public in their entirety (*e.g.*, public
laws, annual reports) must be filed with Commerce and served in accordance with the
requirements set forth in 19 CFR 351.303(b) and 351.303(f) for submission of public
information. If, upon review, Commerce finds that any of the exhibits filed do not match the
exhibits that Commerce decided to take during verification, Commerce will notify the submitter
and other parties, and will take appropriate steps to address any inconsistencies.

All exhibits must be filed electronically using Enforcement and Compliance's Antidumping and
Countervailing Duty Centralized Electronic Service System (ACCESS). An electronically filed
document must be received successfully in its entirety by Commerce's electronic records system,
ACCESS, by 5 p.m. ET, unless otherwise specified by Commerce, on the fifth business day after
verification is completed. Commerce has temporarily modified certain of its requirements for
serving documents containing business proprietary information until further notice.[1] Documents
excepted from the electronic filing requirement under 19 CFR 351.303(b)(2)(ii) must be filed
manually (*i.e.*, in paper form) with the APO/Dockets Unit in Room 18022 and stamped with the
date of receipt on the fifth business day after verification is completed.

If you have any questions regarding this verification or feel you cannot perform certain
verification procedures, contact Samuel Shobowale at (202) 482-6208 or Alma (Angie)
Sepúlveda at (202) 482-2518.

Sincerely,

Michael P. Martin
E&C, Office of Accounting
Supervisory Accountant

---

[1] *See Temporary Rule Modifying AD/CVD Service Requirements Due to COVID-19*, 85 FR 17006 (March 26, 2020);
*Temporary Rule Modifying AD/CVD Service Requirements Due to COVID-19; Extension of Effective Period*, 85 FR
29615 (May 18, 2020); and *Temporary Rule Modifying AD/CVD Service Requirements Due to COVID-19;
Extension of Effective Period*, 85 FR 41363 (July 10, 2020).

TATNEFT and Tolyattikauchuk                                    A-821-835
Cost Verification Agenda                                         Page 4

## I.  <u>GENERAL</u>

The verification will focus on the latest cost data file and the worksheets, reconciliations, and other links to the companies' books and records.  Therefore, all original worksheets, reconciliations and links must be available at verification.

A.  If minor errors were found in any of your previously submitted filings they must be presented at the start of verification.[2]  For each minor correction, provide the following information.
  1.  A description of the error.
  2.  The value of the error.
  3.  A list of all control numbers (CONNUM) effected, as well as the effect on each CONNUM's total cost of manufacturing (TOTCOM).
  4.  The percentage change the error has on the total reported costs.

B.  Costs for the following products will be reviewed in detail at the verification.  Therefore, complete supporting documentation must be prepared in advance for each.[3]
  1.  CONNUM [  ]
  2.  CONNUM [  ]
  3.  CONNUM [  ]
  4.  Non-subject Product Code [            ]

## II.  <u>REVIEW OF COMPANY'S FINANCIAL ACCOUNTING AND COST ACCOUNTING SYSTEMS</u>

The purpose of this section is to give the verifier a more complete understanding of the accounting systems and reporting methods.  The discussions should focus on what was reported in the respondent's cost submissions.

A.  Discuss the corporate structure of TATNEFT including all consolidated and non-consolidated affiliated parties.  Identify all companies involved in the various aspects of the production and sale of the merchandise under consideration.

---

[2]/  Minor errors are minor mistakes in addition, subtraction, or other arithmetic function, minor data entry mistakes, clerical errors resulting from inaccurate copying, duplication, or the like, and minor classification errors. Minor errors do not include items such as methodology changes.

[3]/  Complete supporting documentation consists of a complete trail of calculations for the amounts reported in each cost of manufacturing field on the COP/CV data file.  As necessary provide, calculations of quantities and values, supporting schedules, copies of selected invoices or copies of pages from sub-ledgers to trace the reported per-unit amount reported for each field back to the accounting data kept in the normal course of business.  The documentation must clearly demonstrate the allocation of common costs between specific products, both subject and non-subject.

B. Review accounting procedures and policies.
  1. Discuss <u>TATNEFT</u> financial accounting system.
     a. Review and discuss the financial statements and trial balances normally prepared by the company.
     b. Discuss all significant accounting policies effecting assets, liabilities, expenses, and revenues (*e.g.*, valuation methodology, lower of cost or market policy, accounting entries, year-end adjustments).
     c. Review the structure and operation of the financial accounting system; review the chart of accounts, general ledger and subsidiary ledgers with company officials.

  2. Discuss <u>Tolyattikauchuk's</u> cost accounting system. The focus here can be general and the details may be left for discussion while reviewing the specific cost buildups.
     a. Discuss the extent to which the company normally tracks product specific costs.
     b. Review and discuss sections of the company's submissions that describe the methodologies used to account for and to allocate materials, labor and overhead costs to each product in the normal course of business.
     c. Obtain sample copies of cost accounting reports normally generated.  Review the reports and discuss with company officials how the information was used in preparing the response.
     d. Discuss how the company used the product costs calculated in the normal course of business to determine the reported product-specific costs. Review how they were extracted from the company's accounting systems and compiled for reporting purposes.
     e. Identify any differences between product costs calculated in the normal course of business and the company's reported per-unit costs.

C. Discuss <u>Tolyattikauchuk's</u> production process.
  1. Review the production process with company officials.

  2. Review sample copies of production reports generated from the production control system.
  3. Discuss with company officials what production data is used by the cost accounting system and the inventory system.

## III. <u>COST RECONCILIATIONS</u>

The main objective of this section is to determine whether <u>TATNEFT's</u> overall costs have been appropriately included or excluded from the reported costs.  This section takes a "top down" approach (*e.g.*, financial statements to per-unit cost), starting with cost of sales from the financial statements and proceeding step-by-step down through the cost of manufacturing for the reporting period to the summation of the reported per-unit costs.  Section IV below takes a "bottom up"

Barcode:4268714-01 A-821-835 INV - Investigation  -

approach in verifying the per-unit costs and how they reconcile with <u>TATNEFT and Tolyattikauchuk's</u> normal cost and financial accounting systems.  The steps identified in this section <u>must</u> be accomplished before proceeding to any other areas of the agenda and before any additional testing can be performed.

A. Review the reconciliation of **TATNEFT's fiscal year income statement** (*i.e.*, revenues, cost of goods sold, selling and administrative expenses, and non-operating expenses) in <u>TATNEFT's</u> fiscal year ended December 31, 2021 (FY 2021) audited financial statements **to TATNEFT's total costs in the financial accounting system** (*e.g.*, general ledger or trial balance) **submitted to Commerce in "exhibit SD-6" updated cost reconciliation for PJSC TATNEFT for FY 2021**.  Discuss each reconciling item and obtain supporting documentation for all major or unusual reconciling items.

B. Review the reconciliation of **TATNEFT's total FY 2021 cost of goods sold** (or equivalent) from the financial accounting system **to TATNEFT's total POI costs of goods sold** (or equivalent) **submitted to Commerce in "exhibit SD-6" updated cost reconciliation for PJSC TATNEFT for FY 2021**.  Discuss each reconciling item and obtain supporting documentation for major reconciling items.

C. Review the reconciliation of **TATNEFT's total POI cost of goods sold to TATNEFT's total of the per-unit manufacturing costs submitted to Commerce in the "tatcop02" cost file** (*i.e.*, multiply the reported COMs of all merchandise under consideration for the POI by their respective production quantities, then sum the totals).  Discuss each reconciling item and obtain supporting documentation for major reconciling items.

## IV. <u>REPORTED PER-UNIT COSTS</u>

The main objective of this section is to determine whether: 1) expenses have been correctly allocated between individual products; 2) expenses have been correctly allocated between merchandise under consideration and merchandise not under consideration; 3) the allocation bases used for particular expenses are reasonable; and 4) expenses are classified correctly.

A. CONNUM Cost Buildup
  1. For each of the CONNUMs selected above at I.B, perform the following:

      a. If the CONNUM-specific cost is itself a weighted-average cost of several unique products, review worksheets showing the calculation of the weighted-average figures for the CONNUM.  The worksheets must show all products produced which were weight-averaged together to obtain the costs for the specified CONNUMs.  For each unique product shown on the worksheet, it must show the product's internal product code, production quantity, and corresponding value for each computer field.  Test the weight averaging and trace the costs to the worksheets.

TATNEFT and Tolyattikauchuk                                                      A-821-835
Cost Verification Agenda                                                              Page 7

    b. For the unique product with the highest production quantity in each set of worksheets reported for question IV.A.2, obtain product cost buildup worksheets that demonstrate how each data field within TOTCOM was determined (e.g., the allocations made, the source data from the system used in the calculation, and the historical values from your records).

    c. Review a worksheet that shows the production costs of each facility (*i.e.*, TATNEFT and Tolyattikauchuk). Trace the costs to the company-specific cost files (*e.g.*, the individual fields included therein).

    d. Demonstrate that the classification between reportable and non-reportable products was appropriate.

B. Production Quantities
    1. Reconcile the total quantity of ESBR produced during the POI (*i.e.*, extended total of PRODQTY column) to <u>Tolyattikauchuk's</u> production records.

    2. Trace the reported production quantities for the finished products that are in each selected CONNUM identified in I.B above to production or inventory records.

C. Materials
    1. Review the schedule (*see Exhibit D-10 of the 28Feb22 section D)* that shows <u>TATNEFT's</u> monthly inventory movement of [                                      ] for the POI (*i.e.*, quantity and value of beginning inventory, purchases, consumed in the production process, other adjustments, and ending inventory).
    a. Trace beginning and ending inventory to the financial accounting system (*i.e.*, trial balance or financial statements).
    b. Trace the quantities consumed in the production of finished products to inventory and/or production records. Tie the value consumed in production to the calculation of the per-unit material cost included in the reported costs.
    c. Trace purchases to purchase journals or inventory records. Trace selected transactions to supporting invoices. Identify how taxes, duties, transportation costs, etc. have been accounted for in the reported costs.

    2. Review the product cost buildup worksheets (IV.A.3) for <u>TATNEFT</u> that show the calculation of the per-unit material cost for the products listed in I.B. The worksheets must show the calculations for total direct material cost in COM, as well as the individual material cost fields. The worksheets should include the calculation or inclusion of the yield loss at each subsequent production stage, and any by-product or scrap revenue offset.

Barcode:4268714-01 A-821-835 INV - Investigation  -

    a. Trace the quantities and values for the elements in the calculation of material costs in <u>TATNEFT's</u> product cost buildup worksheets to source records from the financial and cost accounting systems.

    b. For each selected product, recalculate the per-unit material costs shown on <u>TATNEFT's</u> product cost buildup worksheets and trace to the material costs reported in the cost database (DIRMAT).

3. Review and document that material costs are assigned specifically to the individual products that contain the given material (*i.e.*, material costs are not averaged across all products).

E. Conversion Costs – Fixed Overhead Costs

    1. Review the product cost buildup worksheets (IV.A.3) for <u>Tolyattikauchuk</u> that show the calculation of the per-unit conversion costs for the products listed in I.B. The worksheets must show the calculations for each category of conversion costs in COM.

    a. Trace the quantities and values for the fixed overhead costs in <u>Tolyattikauchuk's</u> product cost buildup worksheets to source records from the financial and cost accounting systems.

    b. For each selected product, recalculate the per-unit conversion costs shown on <u>Tolyattikauchuk's</u> product cost buildup worksheets and trace to the conversion costs reported in the cost database (LABOR, VOH, FOH).

    2. Review and test that the conversion costs are allocated on a reasonable basis (i.e., cost driver) and are specific to the conversion activities associated with individual products. If different processes are applied to specific products within a production location document that a product is allocated only the relevant costs associated with the process it receives.

F. Affiliated Party Purchases

    1. Review the price comparison of materials or services purchased from affiliated and unaffiliated suppliers submitted at "exhibit SD-26" sample monthly [        ] payment calculations.

    2. Test the comparison by tracing amounts listed for the purchase of materials or services from both affiliated and unaffiliated suppliers to the purchase journal or other company records.

    3. Review the actual cost of production of the product or service purchased from affiliated suppliers to determine that all costs (including G&A and interest) have been included in the input's cost of production.

Barcode:4268714-01 A-821-835 INV - Investigation  -

## V.  SELLING, GENERAL AND ADMINISTRATIVE EXPENSES

A.  Review the worksheet showing the calculation of TATNEFT's general and administrative (G&A) expense rate (*see Exhibit SD-8 of the 11May22 supplemental section D*).  Trace the total selling expenses, G&A expenses and cost of sales to TATNEFT's FY 2021 audited unconsolidated financial statements.  Recalculate the per-unit G&A expense amount and trace the amount to the G&A expense reported in the cost database.

B.  Identify on the FY trial balance, or other company records, the total packing costs, selling expenses, movement costs and G&A expenses that are included in the cost of sales amount on the financial statements.  Ensure that they are removed from the denominator of the G&A expense rate.

C.  Obtain a schedule that identifies all major categories of selling and G&A expenses.  Review the classification of expenses between selling and G&A.  Ensure the expenses classified as selling expense, packing costs, and movement costs agree with the items reported in section B and C or the sales verification exhibits.

D.  Obtain a schedule showing all non-operating and extraordinary income and expense items (*e.g.*, exchange gains and losses, other income and expense, dividend income, etc.).  Reconcile the schedule to the financial statements and identify how each of these items is accounted for in the submitted costs.  For selected items, review the general ledger account detail and obtain copies of supporting documentation.

## VI. FINANCIAL EXPENSES

A.  Review the worksheet showing TATNEFT's calculation of the financial expense rate (*see Exhibit SD-9 of the 11May22 supplemental section D*).  Recalculate the per-unit financial expense amount and trace the amount to the financial expense reported in the cost database.

B.  Determine that the net exchange gains and losses have been included in the financial expense rate calculation.

C.  Trace the interest expense, net exchange gains and losses, interest income and cost of sales used to calculate the financial expense rate to TATNEFT's FY 2021 audited consolidated financial statements.

Barcode:4268714-01 A-821-835 INV - Investigation -

TATNEFT and Tolyattikauchuk                                                    A-821-835
Cost Verification Agenda                                                       Page 10

## **Attachment 1**

To facilitate the proceedings, please have the following available for the verification.

1. For each verification procedure that indicates the verifiers must obtain a list, a schedule, a description, etc., the item must be prepared in advance and available on the first day of verification.
2. A complete set of all your submissions.
3. Copies of the worksheets used to link the submitted amounts to TATNEFT and Tolyattikauchuk's records.
4. Original records and other source documentation used to prepare any part of the response (*e.g.*, a general ledger, trial balance, purchase journals, production reports, inventory ledgers, fixed asset ledgers, etc.).
5. Appropriate personnel who are knowledgeable about TATNEFT and Tolyattikauchuk's data in the response.
6. Appropriate personnel who are knowledgeable about TATNEFT and Tolyattikauchuk's accounting system.
7. Appropriate personnel with remote access to TATNEFT and Tolyattikauchuk's accounting system so that the verifiers may observe inquiries within the accounting system.